OPINION
{¶ 1} Plaintiff-appellant, Simone V. Pleasant ("appellant"), appeals from the October 23, 2003 judgment entry of the Franklin County Court of Common Pleas rendering judgment in favor of defendant-appellee, EMSA Correctional Care, Inc. ("EMSA"). For the reasons that follow, we affirm the decision of the trial court.
 {¶ 2} On January 5, 1999, at 5:43 a.m., appellant was arrested and charged for domestic violence and assault as a result of an altercation with her husband[1] Appellant was handcuffed behind her back and escorted to the Clintonville Police Station, and later transferred to the Franklin County Correction Center (Franklin County Jail) where she was booked at 8:50 a.m., but remained handcuffed until 9:46 a.m. Appellant testified that the handcuffs were too tight and after she mentioned it to the police officers, they loosened the handcuffs. (Tr. Vol. II, 197-198.)
 {¶ 3} The next morning, on January 6, 1999, appellant was taken to court, where she was handcuffed for several hours. After the hearing, appellant was transferred to the women's workhouse at the Jackson Pike facility. Appellant testified that during the transport all the women inmates were handcuffed together. Appellant testified that it was cold and all she had on was "one of the little shirts, the prison clothes, but no jacket and flip flops and some real thin socks." Id. at 165. Appellant testified that her hands did not hurt while in the handcuffs and that she was fine. Id. at 165-166.
 {¶ 4} On January 8, 1999, Corporal Elisabeth Kirby of the Franklin County Sheriff's Office was working overtime as the second shift supervisor at the Jackson Pike facility. At about 8:00 or 8:30 p.m., Kirby received a radio message from the One East Discipline Area of the facility where appellant was housed. When Kirby arrived to that area, she observed appellant standing on top of the metal sink unit, pounding on a fire/smoke detector on the ceiling, and yelling and screaming. Kirby described appellant's behavior as "totally out of control." (Tr. Vol. III, 9.) Appellant testified that she suffers from bipolar disorder and has to take Pamelor two times a day to think clearly. (Tr. Vol. II, 157.)
 {¶ 5} Kirby ordered appellant off the sink. Appellant did not obey Kirby's orders. The deputies opened appellant's cell door and Kirby once again ordered appellant down off the sink. Appellant remained on the sink and continued to scream and yell. Kirby maced appellant, which had no effect on her. Kirby contacted the EMSA[2] medical staff to notify a nurse that appellant would have to be decontaminated to get the mace out of her eyes.
 {¶ 6} Kirby ordered the deputies to restrain appellant. The deputies got a mattress, took control of appellant by her arms and legs, placed her down on the mattress face down, handcuffed her hands behind her back and placed her legs in leg irons. As the deputies picked appellant up, she continued to yell, scream, and thrash around. (Tr. Vol. III, 10.)
 {¶ 7} Appellant was then placed in a Pro-Straint Chair. Kirby testified that she made the decision to place appellant into the Pro-Straint Chair due to appellant's behavior. Id. at 13. Kirby testified that the chair was designed to help control appellant so that she could not hurt herself. Id. at 10-11. Once in the chair, Kirby testified that the deputies and the EMSA nurse double-checked the handcuffs and the leg irons to make sure they were double locked so they could not accidentally tighten up on appellant. Kirby testified that the EMSA nurse checked the restraints and made sure that there was circulation and that appellant was not losing blood flow. Id. at 27. Kirby further testified that, on the Pro-Straint Chair "there are straps that go across the body. There is an area in the back of the chair behind the person's back that comes out of this Pro-Straint Chair. The hands fit down in this area and the handcuffs fit down in there also so that they're not laying on their hands. Their hands are below their body area which helps to protect the hands. The legs have a strap that go across them. This is how we put her in the chair." Id. at 11.
 {¶ 8} After appellant was placed in the chair, she was taken to the North Booking Area and placed in an individual holding cell where she was monitored by a sergeant or supervisor of that area. Kirby testified that as supervisor, she decides how long to keep an inmate in the Pro-Straint Chair. Kirby testified that since appellant continued to be disruptive for most of the time she was in the chair, appellant remained restrained until she sufficiently calmed down. After appellant calmed down, she was released between 12:50 and 1:00 a.m.
 {¶ 9} Ann Hall, a Licensed Practicing Nurse, was employed for EMSA in January 1999. Nurse Hall testified that on January 8, 1999, she came into contact with appellant at 9 p.m. Id. at 140. Nurse Hall stated that the deputies told her that appellant was doing a cheerleading routine, while using inappropriate language for 16 hours nonstop. Nurse Hall testified that once the deputies placed appellant in the Pro-Straint Chair, she talked with appellant and tried to calm her down. Id. at 143. Nurse Hall testified that appellant's behavior was manic and as a result she made a mental health referral for appellant to be evaluated "ASAP." Id. at 157, 159.
 {¶ 10} Nurse Hall, every hour, would check appellant's circulation by putting two of her fingers in-between appellant's cuffs, checking appellant's hands and checking the capillary refill and also checking appellant's legs for pedal pulses. Id. at 144-145. Nurse Hall testified that appellant's hands were warm and she did not notice any discoloration or blood blistering on appellant's hands. Id. at 106-107. Nurse Hall stated that the whole time appellant was in the chair, appellant was yelling, screaming obscenities, and chanting. Id. at 110, 144.
 {¶ 11} Nurse Hall testified that, as a nurse for EMSA she did not have the authority to direct the deputies to remove the metal handcuffs from appellant while she was placed in the Pro-Straint Chair. Id. at 145. Nurse Hall did, however, have the authority to direct the deputies to loosen the metal handcuffs if they posed a danger to appellant. Nurse Hall testified that when she checked appellant at 12 a.m., appellant had calmed down, as she was asleep. Nurse Hall testified that at 1 a.m., when appellant was released from the Pro-Straint Chair, appellant did not present any risk of harm to herself or anyone else, and Nurse Hall did not see the need to refer appellant for mental health or psychiatric treatment. Id. at 152. Appellant was able to move her hands, her arms, and able to grab Nurse Hall's hand Id. at 149. At 1:15 a.m., a different nurse, also employed by EMSA, checked appellant and documented that appellant showed no signs of distress, discomfort, no redness or irritation to the eyes, nor did she complain of pain. Id. at 150.
 {¶ 12} Nurse Hall followed up with appellant at 4 a.m., and documented that appellant was calm, coherent, had a level of consciousness times three,[3] and was requesting a shower and change of clothing. Id. at 149. Nurse Hall testified that she provided reasonable appropriate nursing care to appellant and that she conducted the appropriate evaluation of appellant to ensure that appellant's circulation was good. Id. at 161-163.
 {¶ 13} On January 11, 1999, appellant was admitted to Columbus Community Hospital ("CCH") for possible frostbite. At appellant's initial physical assessment, the admitting nurse noted that appellant was black and blue over her entire body, especially her hands.
 {¶ 14} Dr. Won Song, an orthopedic surgeon, saw appellant on January 15, 1999. Dr. Song testified that his impression of appellant was that she developed gangrene of her left index and middle fingers and her right index, middle, and ring fingers. (Tr. Vol. II, 113.) Dr. Song saw appellant over the next four days. On January 17, 1999, Dr. Song noted that appellant developed some "mottling, ecchymosis, on the dorsum of the left hand, more demarcation, gangrene of the left index, middle finger." Id. at 115-116. Dr. Song was unable to give his opinion as to when the discoloration on appellant's fingers manifested itself. Dr. Song indicated that appellant's gangrene was either caused by frostbite or trauma. Id. at 117. Dr. Song testified that frostbite was his first guess and not trauma because with trauma there is not just injury to the tip of a person's fingers, as in appellant's case. Id. at 119. Dr. Song testified that even though he did not examine appellant's whole body, he did not notice any signs of trauma. Id. Dr. Song later testified that the cause of appellant's gangrene could be a combination of frostbite, medication, and intoxication. Id. at 126. Dr. Song testified that he could not conclude that the handcuffs caused appellant's gangrene: "In my opinion, if the patient intoxicated and have trauma, any little thing can trigger it and create a problem." Id. at 138.
 {¶ 15} Dr. James Ballero, appellant's expert witness, testified that appellant had chronic occlusion of the ulnar arteries, causing the blood supply to her pinkies to be slow. Dr. Ballero opined that the period of time that appellant was handcuffed at the time of her arrest did not cause her gangrene and multiple amputations. Dr. Ballero testified that because appellant was coherent at the time of her arrest, any injuries she sustained as a result of being handcuffed would have been complained of at that time. Id. at 30-31. Secondly, Dr. Ballero testified that if appellant was injured at the time she was arrested, the bruising of the wrist would have been seen and obvious when she was placed in the Pro-Straint Chair. Furthermore, the changes noted on February 13, 1999, and first noted on February 11, 1999, would have been advanced if the injuries occurred at the time of appellant's arrest. Id. at 31.
 {¶ 16} Dr. Ballero, however, did testify that appellant's injuries were caused by the inappropriate application of the metal handcuffs in the Pro-Straint Chair, which compressed appellant's radial arteries causing little blood clots to form in the arteries, which then spread down to appellant's fingers. Id. at 17, 57. Dr. Ballero opined that, from a medical point of view, a combative mentally ill inmate is going to strain against the cuffs and probably cause injury as a result of the straining. Id. at 61, 64.
 {¶ 17} Dr. Blair Vermilion, EMSA's expert witness in vascular surgery, testified that after reviewing the medical records, he opined that the most probable cause for the gangrene that appellant developed was secondary to frostbite. (Tr. Vol. IV, 13.) Dr. Vermilion testified that more likely than not appellant had frostbite at the time of her arrest on January 5, 1993, and that it was possible for a person with frostbite in two fingers on each hand to still have warm hands. Id. at 32. Dr. Vermilion testified that a person would have a palpable pulse and a normal capillary refill. Id. at 33. Dr. Vermilion testified that if appellant had atresia, he would expect no collaterals or secondary vessels. However, according to his review of the reports, there were routes around the ulnar artery supplying blood to appellant's hand; evidencing the presence of collaterals and that appellant did not suffer from atresia. Id. at 35.
 {¶ 18} On August 16, 2000, appellant filed a complaint against Franklin County, Ohio Board of County Commissioners, EMSA Correctional Care, Inc., Southeast, Inc., and John Does 1-10, alleging a violation of Section 1983, Title 42, U.S. Code, assault and battery, and medical malpractice.[4] Appellant sought damages in the amount of $25,000.
 {¶ 19} Appellant's case was tried from September 29 through October 8, 2003. The jury returned a unanimous verdict in favor of EMSA and against appellant. On November 21, 2003, the trial court entered judgment in favor of EMSA. Appellant appealed and assigned the following as error:
1. The trial court erred in refusing to grant plaintiff's motion, in limine, requesting an order precluding defense counsel from delving into the underlying face and chest stabbing allegations surrounding appellant's underlying domestic relations arrest — charges in connection with which she was never convicted.
2. The trial court erred in refusing to grant either of plaintiff's proposed jury instructions pertinent to plaintiff's preexisting medical condition.
3. The trial court erred by submitting a jury interrogatory directing the jury to return a defense verdict regardless of whether defendant violated nursing standards, in general, rather than, "correctional facility" nursing standards, in particular.
 {¶ 20} In her first assignment of error, appellant argues that the trial court committed plain error when it refused to grant appellant's motion in limine to preclude EMSA from probing into the allegations surrounding appellant's arrest.
 {¶ 21} The established rule in Ohio is that the grant or denial of a motion in limine is not a ruling on the evidence.State v. Grubb (1986), 28 Ohio St.3d 199, 200-201. The ruling is preliminary, thereby requiring the parties to raise specific evidentiary objections at trial in order to permit the trial court to consider the admissibility of the evidence in its actual context. Haslam v. Russell (Dec. 8, 2003), Monroe App. No. 03 MO 3, 2003-Ohio-6724, at ¶ 51, citing Grubb at 202. As a result, the failure to object to the evidence at trial waives the right of the objecting party to raise the court's ruling on the preliminary motion as error on appeal. Id., citing Grubb at 202-203.
 {¶ 22} In Grubb, the Supreme Court of Ohio cited the following from Palmer, Ohio Rules of Evidence Rules Manual (1984), "`An appellate court need not review the propriety of such an order unless the claimed error is preserved by an objection, proffer, or ruling on the record when the issue is actually reached and the context is developed at trial.'"Grubb, at 203 (emphasis omitted), citing Palmer, at 446; Statev. Williams (1977), 51 Ohio St.2d 112, paragraph one of the syllabus, vacated in part on other grounds (1978), 438 U.S. 911,98 S.Ct. 3137.
 {¶ 23} In this case, appellant filed a motion in limine to preclude the details of her domestic violence charges from being admitted into evidence. Appellant maintained that the details would inflame the jury. The record in the case reveals the following opening statements by counsel for EMSA:
First of all, on January 5th, 1999 at about 5:43 in the morning, Ms. Pleasant was arrested at her home. She'd been involved in a domestic dispute with her husband The evidence will show that she stabbed her husband in the face and chest with a steak knife. And that as a result of that, the police came to her residence and arrested her and placed her in handcuffs at that time.
(Tr. Vol. I, 28.)
 {¶ 24} Defense counsel did not object. Appellant's failure to object to EMSA's opening statements at trial waived all but plain error for purposes of appeal. In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error seriously affects the basic fairness, integrity, or public reputation of the judicial process itself. Goldfuss v. Davidson
(1997), 79 Ohio St.3d 116, syllabus.
 {¶ 25} Appellant maintained that the reference to appellant's prior bad act "was grossly unjust, inflammatory, and may have confirmed jurors' worst potential prejudices about the mentally ill or incarcerated." (Appellant's Brief, at 6.) After a careful review of the record, we find that the circumstances in this case do not rise to the level of plain error, as there is nothing in the record to indicate that the jury failed to follow its instructions to consider only evidence presented at trial, and not to consider the opening statements of counsel as evidence. See State v. Houseman (June 29, 2000), Belmont App. No. 98 BA 4. As such, appellant's first assignment of error lacks merit and is not well-taken.
 {¶ 26} In her second assignment of error, appellant maintains that the trial court erred in refusing to grant appellant's proposed "eggshell skull" jury instruction on her pre-existing medical condition. Appellant maintains that because she suffered from atresia, she was vulnerable to arterial clotting while handcuffed. The proposed jury instruction read: "`A defendant who negligently inflicts injury on another takes the injured party as [it] finds her and is liable for the actual injury and damages suffered directly from the Defendant's negligence. If you find that the Plaintiff in this case had a pre-existing disposition which made her more susceptible to injury, nevertheless, a negligent wrongdoer is liable for the actual injury [proximately caused], if any, which the Plaintiff sustained as a result of the Defendant's negligence.'" (Plaintiff's Second set of Proposed Jury Instructions, Appellant's brief, appendix.)
 {¶ 27} Appellant maintains that absent this "eggshell skull" jury instruction, the jury was free to assume that EMSA was not negligent in caring for appellant.
 {¶ 28} The purpose of a jury instruction is, "to state clearly and concisely the principles of law necessary to enable the jury to accomplish the purpose desired." Cleveland Elec.Illum. Co. v. Astorhusrt Land Co. (1985), 18 Ohio St.3d 268,272, citing Pickering v. Cirell (1955), 163 Ohio St. 1, 4. The trial court should give a requested jury instruction if it is a correct statement of the law applicable to the facts in the case, and if reasonable minds could reach the conclusion sought by the instruction. See, Murphy v. Carrolton Mfg. Co. (1991),61 Ohio St.3d 585.
 {¶ 29} "A jury charge must be considered as a whole and a reviewing court must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." Becker v. Lake County MemorialHosp. West (1990), 53 Ohio St.3d 202, 208. The decision to issue a particular jury instruction rests within the sound discretion of the trial court. Cabe v. Lunich (1994), 70 Ohio St.3d 598,602. Hence, this court will not reverse the trial court's decision to give a certain jury instruction unless there is an abuse of discretion. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 30} In this case, when appellant's counsel asked Dr. Ballero's opinion as to what caused appellant's fingers to turn black and require amputation, Dr. Ballero testified that injury was caused by the inappropriate application of the metal handcuffs that compressed appellant's radial arteries, resulting in blood clots that spread to appellant's fingers. (Tr. Vol. II, 17.) Dr. Ballero, who did not examine appellant but only reviewed the CCH hospital records, did not conclude in his testimony that appellant's pre-existing condition of atresia made her more susceptible to injury. Furthermore, EMSA introduced evidence and other expert testimony tending to disprove appellant's pre-existing condition claim. Dr. Vermilion's, EMSA's expert witness, testified that, based on his review of the CCH records, he did not know if appellant even suffered from atresia. (Tr. Vol. IV, 33.)
 {¶ 31} The record lacks evidence to support the requested instruction. As such, there is no evidence of an abuse of discretion by the trial court on this issue. Appellant's second assignment of error lacks merit and is not well-taken.
 {¶ 32} In her third and final assignment of error, appellant argues that the trial court erred in submitting an incorrect jury interrogatory, which instructed the jury to find EMSA negligent under a "correctional facility" nursing standard of care.
 {¶ 33} "A charge to the jury must be viewed in its totality, and if the law is clearly and fairly expressed, no reversal will be predicated upon error in a portion of the charge." Yeager v.Riverside Methodist Hosp. (1985), 24 Ohio App.3d 54, paragraph one of the syllabus; Wagenheim v. Alexander Grant Co. (1983),19 Ohio App.3d 7, paragraph 13 of the syllabus; Schade v.Carnegie Body Co. (1982), 70 Ohio St.2d 207, 210.
 {¶ 34} The trial court does not commit reversible error as long as the law is clearly and fairly expressed to the jury so that the jury has an understanding as to how the law applies to the facts in the case at hand Wagenheim, at 16. Even if reversible error exists, the substantial rights of the party complaining of the charge must be directly affected and to his prejudice before a reversal can be justified. Ohio Farmers' Ins.Co. v. Cochran (1922), 104 Ohio St. 427, paragraph four of the syllabus.
 {¶ 35} Before giving the charge to the jury, counsels for appellant and EMSA had a conversation with the judge outside the presence of the jury. Appellant's counsel objected to EMSA's interrogatory specifically referencing nursing care in a correctional center, instead of nursing care in general. (Oct. 9, 2003 Tr. 3.) The trial judge noted that he would give the interrogatory as written. Id. at 6. The interrogatory presented to the jury read:
Do you find that plaintiff has proven by a preponderance of the evidence that the nurses employed by EMSA Correctional Care, Inc. failed to meet the standard of care of nurses practicing in a correctional facility in 1999 under the same or similar circumstances?
(Appellant's Brief, appendix.)
 {¶ 36} During the charge to the jury, the trial court stated, in part:
Negligence is a failure to use ordinary care. Every person is required to use ordinary care to avoid injuring another person or their property. Ordinary care is the care that a reasonably cautious, careful and prudent person would use under the same or similar circumstances.
Nurses must employ the degree of care and skill that nurses of ordinary care, skill and diligence should employ under like or similar conditions or circumstances. * * *
(Oct. 9, 2003 Tr. 17.)
 {¶ 37} Appellant wanted the interrogatory to have more of a general reading instead of referring to the "standard of care of nurses practicing in a correctional facility." Appellant maintained that the interrogatory "suggest[ed] to the jury that inmates are in jail for a reason, that they are not entitled to the same standard of nursing care and, in turn, inmate `nurse advocates' should not be judged by the light of the `ordinary care' jury instruction given to them by the Court." (Appellant's Brief, at 13.)
 {¶ 38} Viewed in its totality, the interrogatory quoted supra accurately set forth the law. Appellant has failed to show that the interrogatory was prejudicial and affected her substantial rights. As such, the trial court did not err in submitting EMSA's proposed interrogatory to the jury. Appellant's third assignment of error lacks merit and is not well-taken.
 {¶ 39} For the foregoing reasons, appellant's three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Sadler, J., concurs.
Brown, J., concurs separately.
[1] The charges against appellant were subsequently dismissed.
[2] EMSA acted under contractual duty with Franklin County to provide medical services to persons taken into custody by the Franklin County Sheriff's Office.
[3] Appellant knew her name, where she was, the date, the time, and who was the president.
[4] On September 19, 2000, defendants Franklin County, Ohio Board of County Commissioners, EMSA Correctional Care, Inc., and Southeast, Inc., filed a notice of removal to Federal Court. On February 27, 2002, appellant filed a motion to voluntarily dismiss the claims against the Franklin County defendants. The Federal Court granted appellant's motion, dismissing those defendants with prejudice and remanding the state law claims against EMSA to Franklin County Court of Common Pleas.