DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant, Terry Walker, individually and as administrator of the estate of Melea Walker, appeals the judgment of the Summit County Court of Common Pleas, which rendered judgment in favor of appellees, Catherine Kittrell, M.D., Rebecca Bell, D.O., and Summa Health Systems/Akron City Hospital; Leslie Wilkof, M.D., and Cuyahoga Valley Womens Healthcare, Inc.; and Theodore Bobinsky, M.D., Roberta Stafford, C.R.N.A., and Professional Anesthesia Service. This Court affirms. *Page 2 
 I. {¶ 2} Melea Walker was vacationing in Jamaica with her husband Terry when she developed what she believed to be gastrointestinal pains from food poisoning. She saw the hotel doctor who gave her a shot to abate the pain. She and Terry flew home on Saturday, October 26, 2002. The next morning, Melea was still experiencing pain. She drove herself to the Akron City Hospital emergency room, arriving at 8:22 a.m. Emergency department personnel conducted various tests, including a pregnancy test, which indicated a positive result. Given the significant pain Melea was experiencing, the doctors suspected she had a ruptured ectopic pregnancy. Emergency department personnel confirmed that diagnosis with an ultrasound and notified the on-call attending physician, Dr. Wilkof, at 1:53 p.m., and the in-house residents, Drs. Bell and Kittrell, soon thereafter. The ultrasound also disclosed the presence of blood in Melea's abdomen. The residents arrived and began assessing Melea's condition, and Dr. Wilkof arrived at the hospital at 2:15 p.m.
 {¶ 3} Emergency department personnel had also ordered hemoglobin and hematocrit tests to determine the percentage of red blood cells in her blood. The tests showed very low levels, 5.2 and 15.8 respectively, indicating profound anemia. The attending physician, both residents, the anesthesiologist, Dr. Bobinsky, and the nurse anesthetist, C.R.N.A. Stafford, all discussed the possible need for a blood transfusion, including risks and benefits, with Melea. Melea was *Page 3 
quite reluctant to accept blood products. The professionals discussed the option of an autotransfusion, using a cell saver device, whereby the blood which had pooled in Melea's abdomen could be reinfused into her system. Melea consented to the use of the cell saver and ultimately consented to a transfusion of bank blood if it was absolutely necessary to save her life. Melea received no blood prior to her surgery.
 {¶ 4} During surgery, Dr. Wilkof suctioned the lost blood from Melea's abdomen. Dr. Wilkof was able to reinfuse two units into Melea. Although she had two units of bank blood available for an additional transfusion, she did not transfuse Melea with any bank blood. Dr. Wilkof then stopped any bleeding, excised the ruptured fallopian tube, and removed some adhesions from the other tube to increase Melea's ability to conceive children in the future. Dr. Wilkof concluded the surgery, and the nurse anesthetist reawakened Melea.
 {¶ 5} Melea was taken to the post anesthesia care unit ("PACU") for recovery. After a period of time, she was moved to a room on the floor at approximately 6:00 p.m. Shortly after 11:00 p.m., Melea suddenly became agitated and combative. She began flailing her limbs, breathing rapidly and drifting in and out of consciousness. Terry Walker pushed the call button, and Dr. Bell responded. Dr. Bell called for help and the code team arrived. Dr. Wilkof was notified and she returned to the hospital. The code team tried to resuscitate Melea over the course of an hour, but they were unsuccessful. Melea passed away *Page 4 
at 12:31 a.m. on October 28, 2002. Deputy medical examiner Dr. George Sterbenz performed an autopsy later that same day and opined that Melea "suffered a witnessed `sudden death' due to a cardiac arrhythmia elicited by myocarditis of probable viral etiology." Dr. Sterbenz further opined that the "physiologic stress incurred as a result of the ruptured ectopic pregnancy with pelvic hematoma is a contributory condition."
 {¶ 6} Mr. Walker filed a wrongful death/medical negligence action against the attending physician and her group, both residents, Summa Health Systems/Akron City Hospital, and the anesthesiologists and their group.[1] He voluntary dismissed that action and refiled it on October 27, 2007. All the appellees answered, denying any negligence or that their actions were the proximate cause of Melea's death.
 {¶ 7} The parties engaged in extensive discovery. The matter was scheduled for trial. The parties filed numerous motions in limine. Mr. Walker filed a motion in limine to exclude any evidence regarding Melea's religion, specifically whether she was or might have been a Jehovah's Witness. Mr. Walker argued that such evidence would be unduly prejudicial because of general preconceived notions that persons of the Jehovah's Witness faith refuse blood *Page 5 
transfusions. The record is quite clear that Melea ultimately consented to receiving blood products. The medical professionals opposed the motion in limine, arguing that Melea herself at least inferred that she was a Jehovah's Witness and did not want to receive blood products. The defendants argued that Melea's reluctance to receive blood products for various reasons required much clarification and discussion in relation to her care and treatment. Accordingly, they argued that the probative value was not outweighed by the danger of unfair prejudice because such evidence was relevant to the medical decisions made. The trial court denied the motion in limine. Mr. Walker filed a motion for reconsideration, which the trial court denied. Mr. Walker did not object during trial to the presentation of evidence regarding Melea's status as a Jehovah's Witness.
 {¶ 8} The matter proceeded to trial. At the conclusion of the eight-day trial, the jury returned general verdicts in favor of all the defendants. In response to the interrogatories, the jury found that none of the defendants were negligent. The jury, therefore, did not reach the issue of proximate cause. The trial court issued its final judgment entry on February 6, 2007.
 {¶ 9} Mr. Walker filed a motion for new trial pursuant to Civ.R. 59(A)(6) on February 20, 2007. Mr. Walker argued that the verdict was not sustained by the weight of the evidence. Several defendants filed briefs in opposition to Mr. Walker's motion for new trial. On April 18, 2007, the trial court denied Mr. *Page 6 
Walker's motion for new trial. Mr. Walker timely appeals, raising two assignments of error for review.
 II. ASSIGNMENT OF ERROR I "THE TRIAL COURT ERRED AND COMMITTED AN ABUSE OF DISCRETION IN NOT GRANTING A NEW TRIAL AS THE EVIDENCE SUBMITTED BY THE PLAINTIFFS IN THIS CASE WAS SUBSTANTIAL AND OVERWHELMING AND THE JURY'S VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE."
 {¶ 10} Mr. Walker argues that the trial court abused its discretion by denying his motion for new trial pursuant to Civ.R. 59(A)(6). This Court disagrees.
 {¶ 11} Civ.R. 59(A)(6) provides that a new trial may be granted when the
judgment is not sustained by the weight of the evidence. This Court has held:
 "When an appellate court reviews the grant or denial of a motion for a new trial as against the weight of the evidence, the appellate court does not directly review whether the judgment was against the manifest weight of the evidence. Snyder v. Singer (May 17, 2000), 9th Dist. No. 99CA0020. When considering a Civ.R. 59(A)(6) motion for a new trial, a trial court must weigh the evidence and pass on the credibility of the witnesses. Edwards v. Haase (Aug. 1, 2001), 9th Dist. No. 3121-M. However, the trial court assesses the weight and credibility in a more limited sense than would a jury; the court is to determine, in light of its broad discretion, whether a manifest injustice has occurred. Id.; Burns v. Krishnan (Jan. 28, 1998), 9th Dist. No. 96CA006650, citing Osler v. Lorain (1986), 28 Ohio St.3d 345, 351. Thus, an appellate court reviews the court's decision on that matter for an abuse of discretion. Id. Absent some indication that the trial court's exercise of its discretion was unreasonable, arbitrary, or unconscionable, the judgment of the trial court will not be disturbed. Snyder, supra. *Page 7 
 "A trial judge should `abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result.' (Internal quotations omitted.) Bland v. Graves (1993), 85 Ohio App.3d 644, 651. Where a verdict is supported by competent substantial and apparently credible evidence, a motion for a new trial will be denied. Verbon v. Pennese (1982), 7 Ohio App.3d 182, 183. Additionally, in reaching its verdict, the jury is free to believe all, part, or none of the testimony of each witness. State v. Jackson (1993), 86 Ohio App.3d 29, 33." Prince v. Jordan, 9th Dist. No. 04CA008423, 2004-Ohio-7184, at ¶¶ 34-35.
 {¶ 12} In this case, the trial court denied Mr. Walker's motion for new trial with respect to the issue of whether the defendants were negligent because they failed to meet the requisite standard of care. The Ohio Supreme Court has held:
 "In order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more such particular things." Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, paragraph one of the syllabus.
Furthermore, "[p]roof of the recognized standards must necessarily be provided through expert testimony." Id. at 131-32.
 {¶ 13} In this case, Mr. Walker presented the expert testimony of three witnesses, while the defendants presented the testimony of the individual defendants and four additional experts.
 {¶ 14} Dr. Robert Knapp is an anesthesiologist with expertise in the area of obstetrical anesthesia. He testified that a normal hematocrit level, i.e., the *Page 8 
percentage of red cells in the blood, is between 36 and 45. He noted that Melea's initial hematocrit level was 15, indicating in his estimation that she had lost half of her blood volume. He testified that he based his estimation of her blood loss on the assumption that Melea's everyday hematocrit level was within the normal range. He opined that, while young people such as 24-year-old Melea can compensate for such blood loss for a period of time, they cannot compensate forever. Dr. Knapp testified that Melea needed an infusion of additional blood to pull her heart out of overdrive, its status until it simply quit.
 {¶ 15} Dr. Knapp opined within a reasonable degree of medical certainty that Dr. Bobinsky and C.R.N.A. Stafford breached the standard of care in their overall care of Melea, i.e. as a result of their collective actions before and during surgery and while Melea was in PACU. He testified that their breach occurred as a result of their failure to adequately resuscitate Melea because they did not replace her blood to give her a reasonable degree of safety. He further opined that it was a breach of the standard of care not to get another hematocrit reading prior to surgery.
 {¶ 16} In addition, Dr. Knapp testified within a reasonable degree of medical certainty that "the surgical team," Drs. Wilkof, Kittrell and Bell, did not meet the standard of care because they also failed to give Melea the proper therapy, specifically additional blood to stabilize her, in the face of Melea's instability. He further opined that Melea required closer monitoring while on the *Page 9 
floor because she necessarily would lose the effects of her intrasurgical and recovery resuscitative efforts.
 {¶ 17} Dr. Knapp opined that someone who has lost so much blood, especially into the belly, must receive blood. He testified that it is a breach of the standard of care to fail to give blood pre-operatively under these circumstances because surgery itself poses potential problems. He testified that additional blood was necessary due to Melea's low blood count because anesthesia drugs can lower blood pressure and because surgical incisions may lead to mass bleed from the release of pressure.
 {¶ 18} Dr. Knapp opined that the use of cell saver technology was not adequate in this case for several reasons. First, he testified that much of the 1000cc of blood in Melea's abdomen would have clotted, and it is not possible to suck up and recycle blood clots. He admitted that the surgical record did not indicate that any blood clots had been discarded. Second, he opined that Melea needed much more blood that the 450cc of blood saved. He testified that a human body does not replenish its own blood within a matter of hours; rather, it takes days to weeks for the body to make new blood. Further, he testified that Melea's saved blood was suspect because of its age after having sat in her belly for approximately five days, although he admitted that bank blood loses its oxygen-carrying capacity over time with age as well. He further conceded that bank blood carries risks of infection and immune response, risks not existent with *Page 10 
autotransfused blood. Finally, he testified that the doctors overlooked Melea's extremely low hematocrit level because she was walking and apparently asymptomatic. He testified that in such circumstances, the question is not whether the patient is tolerating the low blood count but rather how long can she tolerate it. Dr. Knapp testified that he believed that the use of cell saver would have been appropriate only in conjunction with the transfusion of additional bank blood.
 {¶ 19} Dr. Knapp testified that the medical record indicates that Melea was reluctant to accept blood products but that she would accept them as a last resort. He testified that a doctor should honor a patient's wishes not to receive blood so long as that decision does not jeopardize the patient's health.
 {¶ 20} Dr. Knapp conceded that Melea's vital signs were normal at various times in the emergency room and post-operatively. He testified that during and after surgery Melea produced urine, a very good sign of adequate blood volume. He testified that when blood volume is inadequate to perfuse the organs with sufficient oxygen, the kidneys do not produce urine.
 {¶ 21} Dr. Knapp opined that he did not agree that myocarditis was the cause of death because he could not reconcile the facts that there was nothing wrong with Melea but then she died because of something so wrong that it stopped her heart. Dr. Knapp admitted that he is not qualified to dispute the medical examiner's findings based on the heart slides relied upon by the medical examiner. He further agreed that blood loss and anemia do not cause viral myocarditis. *Page 11 
 {¶ 22} Dr. Katherine Jasnosz, a pathologist at Allegheny (Pennsylvania) General Hospital, defined pathology as the study of disease processes. She testified that she received recut autopsy slides and also reviewed the original autopsy slides. Based on that review, she testified that she believes that Melea's cause of death is severe anemia due to her ruptured ectopic pregnancy. She testified that she saw no signs of myocarditis in either the original or recut slides, although she admitted that she is not an expert in cardiac pathology. She conceded that a named authoritative text states that the intensity and distribution of inflammatory infiltrates, such as relied upon by the medical examiner in his opinion, are highly variable factors. She further agreed that viral myocarditis frequently has no warning signs or symptoms.
 {¶ 23} Dr. Jasnosz testified that Melea's autopsy showed very minimal findings which could cause death. Therefore, she testified that it was necessary to look at her clinical history and laboratory results. She testified that Melea fell into a life-threatening category of anemia based on her hemoglobin level of 5.2. She opined that, generally, Melea's ruptured ectopic pregnancy led to hemoperitoneum (blood in her belly), which caused severe anemia due to blood loss, which decreased her red blood cell volume and necessarily oxygenation. She opined that this decreased oxygenation led to organ stress, placing a greater stress on her heart, which eventually led to Melea's death. Dr. Jasnosz admitted that she presumed that Melea must have lost 2000-3000cc of blood based on her *Page 12 
hemoglobin level. She conceded that she is not familiar with a cell saver receptacle and does not know how the device measures blood loss.
 {¶ 24} Dr. Jasnosz testified that she had no opportunity to look at the gross heart like the medical examiner did. She admitted that she did see 2 foci of necrotic tissue in the heart slides, but she saw no associated inflammation, necessary to diagnose myocarditis. She testified that Dr. Lisa Kohler, the Summit County Medical Examiner, sent her a letter with the recut slides, asserting that she saw multiple foci of myocarditis. Dr. Jasnosz admitted that sudden death in the young due to myocarditis is not a rare phenomenon.
 {¶ 25} Finally, Dr. Jasnosz agreed that Melea was stable, with good vital signs, from 8:22 a.m. until 11:00 p.m. on October 27, 2002. She testified that if someone were dying from a lack of oxygen due to blood loss, the kidneys would show early signs. She conceded that Melea's urine output was good and that the autopsy report indicated no ischemia (dead tissue) in the kidneys.
 {¶ 26} Dr. Steven Eisinger is a professor of obstetrics/gynecology (OB/GYN) who acts as a consultant for other OB/GYNs and performs a limited number of complicated surgeries himself. He testified that he has very little experience with using cell saver. He testified that he last used cell saver in connection with a cancer case, although he admitted that the use of cell saver is contraindicated in cancer cases. *Page 13 
 {¶ 27} Dr. Eisinger testified that a hematocrit level below 22 indicates profound anemia, which means the blood is delivering a very low oxygen load to the tissues. He testified that young patients can compensate for a time when they have lost a large amount of blood, but then they will "crash." He testified that the relevant clues include a high pulse and low blood count.
 {¶ 28} Dr. Eisinger testified that the standard of care for Melea's condition required both prompt surgery and a blood transfusion, and that a failure to transfuse her constituted a breach of the standard of care. He opined that the failure to transfuse Melea during surgery was a contributing factor to her death. He opined that in the absence of an intrasurgical transfusion, then Melea should have been transfused post-operatively. He testified that it is better to overtreat a patient than to undertreat. Dr. Eisinger testified that the surgeons and anesthesiologists bore joint responsibility for Melea's well-being.
 {¶ 29} Dr. Eisinger testified that they further breached the standard of care by failing to recheck Melea's hemoglobin and hematocrit levels just prior to surgery, because it is necessary to know the patient's condition. He testified that the hematocrit level rises 3 points for every unit of blood received. Because Melea received 2 units of cell saver blood during surgery, her hematocrit level should have increased to 22 post-operatively, but it was only 19. He opined, therefore, that Melea's level had dropped after the initial testing and prior to surgery. He admitted, however, that the 3000cc of fluid which Melea received *Page 14 
before surgery would have caused hemodilution, which would have resulted in lower hematocrit and hemoglobin levels until her system regained equilibrium.
 {¶ 30} Dr. Eisinger testified that Melea died because she bled to death from her blood loss prior to her hospitalization and because that blood was not replaced. He admitted, however, that he is not a pathologist and did not review the autopsy slides. He further admitted that cell saver is a type of blood transfusion and that its use forebears certain risks associated with the transfusion of bank blood.
 {¶ 31} On cross-examination, Dr. Eisinger testified that Dr. Wilkof did not contribute to any delay in Melea's diagnosis or treatment. He further opined that Dr. Wilkof did not deviate from the standard of care by removing adhesions from Melea's remaining fallopian tube in an attempt to preserve her fertility. He testified that Dr. Wilkof acted in good faith but that she nevertheless breached the standard of care. He testified, however, that he could not say that anything that Dr. Kittrell or Dr. Bell did directly contributed to Melea's death, especially because of Dr. Bell's limited experience and the fact that ultimate decision-making lies with the attending surgeon.
 {¶ 32} Dr. Eisinger opined that Melea lost 2000-3000cc of blood because some of the blood lost in the days prior to hospitalization would have been reabsorbed. He testified that the 1000cc measurement was a gross underestimate by the doctors. He testified that if Melea had only lost 1000cc, that would not have caused her death. *Page 15 
 {¶ 33} Dr. Eisinger admitted that Melea's vitals were stable after surgery except for an elevated heart rate. He testified that there was no change in her mentation and that she was not in shock until immediately before her death. He noted that Dr. Bell had ordered notification if Melea's urine output fell below 60cc within a 2-hour period. He testified that urine output is a good indication of perfusion. Dr. Eisinger testified that while the nurses noted a change in the color of Melea's urine from yellow to amber, there were no output measurements in the chart. He opined that Melea's peripheral vasculature was shutting down as evidenced by her more concentrated urine.
 {¶ 34} Dr. David Burkons, a gynecologist, testified that he believed that Melea had severe or profound acute anemia which developed over 5 to 7 days. Although her hemoglobin/hematocrit levels were very low, he testified that doctors should transfuse based on symptoms and vital signs, not merely on lab numbers. He testified, in fact, that a transfusion premised merely on numbers would constitute a breach of the standard of care. He opined that the standard of care regarding transfusions requires a consideration of 1) clinical symptoms, 2) physiologic findings, 3) operative findings, 4) the wishes of the patient, and 5) laboratory findings. He testified that the failure to watch for symptomatic anemia under these circumstances would have been a breach of the standard of care, but that the medical professionals in fact monitored Melea appropriately. Furthermore, he testified that the records evidence that they were watching Melea *Page 16 
for symptomatic anemia, monitoring her urine output, respiration, heart rate, blood pressure, her risk of post-operative bleeding, and her mental state.
 {¶ 35} Dr. Burkons testified that Melea's vital signs were stable during surgery, in recovery, and post-operatively on the floor. He testified that it was reasonable and expected that she would experience some mild tachycardia, i.e. her heart rate would be slightly elevated, prior to surgery due to her pain and apprehension. He emphasized that that did not indicate hemodynamic instability. He testified that her heart rate decreased as expected during surgery at the time of the incision due to the release of pressure, but that the anesthesiologist appropriately compensated for the drop.
 {¶ 36} Dr. Burkons discussed how urine output is an important way to measure oxygenation. He testified that there is sufficient oxygenation if the kidneys are working. He testified that Melea would not have had such good urine output during surgery if she were profoundly anemic, because there would not have been enough blood flow to perfuse the kidneys. He testified that Melea had a Foley catheter in place, so her urine output was being monitored after surgery. He assumed that the output amount was adequate or the nursing staff would have notified Dr. Bell as she ordered. In regard to urine color, he testified that the distinction between Melea's earlier yellow urine and later amber urine could mean higher concentration or could be merely a matter of different perspectives by different nurses. *Page 17 
 {¶ 37} Dr. Burkons testified that a patient who develops a hemoglobin level of 7 or 8 over time will typically do well without a transfusion, whereas a transfusion is more likely indicated if a sudden blood loss precipitated such levels. He testified that younger people generally tolerate a level of anemia, then "suddenly fall off the cliff," but that is typically where the levels are lower than Melea's post-operative anemia was here, and typically where vital signs indicate problems as well. On the other hand, he testified that even where a patient is not particularly symptomatic, it is a good idea to transfuse "before the bottom falls out" where the hemoglobin/hematocrit levels keep dropping because that would indicate on-going bleeding.
 {¶ 38} Dr. Burkons opined that Dr. Wilkof met the standard of care and that nothing she did or did not do affected Melea's death. He further opined that the standard of care did not require the transfusion of additional blood at any time, because Melea was asymptomatic and her hemoglobin/hematocrit levels were undergoing equilibration as she diuressed the quantities of fluids she had received.
 {¶ 39} Dr. Burkons testified that 1000cc blood loss recorded was accurate because the use of the cell saver allows for the recovery of all the blood and measures it. He testified that reabsorption of blood takes a few days, so that the remaining blood in Melea's abdomen would have represented 90% of her blood loss. He testified that the cell saver machine in fact suctions blood clots and prepares them for reinfusion along with non-clotted blood. He opined that Melea *Page 18 
could not have lost 2000-3000cc of blood as Mr. Walker proposed because 1) she could not have driven herself to the hospital in that condition, 2) her abdomen would have been distended, 3) all blood was suctioned by the cell saver which accurately measures the blood, and 4) she would not have presented with good vital signs as she did.
 {¶ 40} Dr. Burkons testified that he found the medical examiner's cause of death due to myocarditis to be reasonable based on Melea's clinical course. He opined that if hypoxia were the cause of death as Mr. Walker proposed, Melea's clinical course would have been completely different. He testified, in that case, her vitals would not have remained stable, her mentation (mental state) would have become foggy, and her kidneys would have shut down long before her death. He opined that ischemia (tissue death) played no role in Melea's death because it was not identified on the autopsy report and Melea never complained of heart pain which would necessarily exist in the presence of ischemia.
 {¶ 41} In conclusion, Dr. Burkons testified that Melea's care addressed blood volume replacement, perfusion and oxygen-carrying capacity, all within the requisite standard of care.
 {¶ 42} Dr. Rebecca Bell was a first year OB/GYN resident in her fourth month of residency and on duty when emergency department staff notified her of Melea's condition a little before 2:00 p.m. on October 27, 2002. She testified that she and Dr. Kittrell began assessing Melea and that Dr. Wilkof arrived soon *Page 19 
thereafter. She was aware the Melea had a ruptured ectopic pregnancy and that she agreed to a blood transfusion only if absolutely necessary. Dr. Bell testified that she called the operating room to set up surgery, and she ordered 2 units of bank blood to be available in case of transfusion. She testified that cell saver technology is often used when patients do not want to receive bank blood to avoid the risk of infection.
 {¶ 43} Dr. Bell testified that she was aware that Melea's hemoglobin/hematocrit levels were very low, but the doctors did not know how low they were because they did not know Melea's baseline levels. She testified that Melea's baseline levels might very well have been low because Melea told her that she sometimes had multiple menstrual periods during the month. She testified that a peripheral blood smear indicated that Melea had recently lost blood but it did not indicate her baseline levels or whether she had anemia at all.
 {¶ 44} Dr. Bell testified that Melea was stable before, during and after surgery, based on her vital signs. She testified that surgery went smoothly, and she wrote the post-operative orders, requesting notification if Melea's urine output dropped below 60cc every 2 hours, her heart rate exceeded 110, or her temperature exceeded 100.5 twice. She testified that decreased urine output could signal hypovolemia (low blood volume) and a need for additional blood or more fluids. She testified that the nursing staff would have monitored Melea's urine output when they observed her Foley catheter bag. She testified that the nursing staff *Page 20 
would follow orders in the normal course and she did not have to call to make sure that they were monitoring Melea to ensure her vitals were within the ordered parameters. In regards to the disparity between the colors of Melea's urine, she testified that urine routinely changes color throughout the day and color can be subjective.
 {¶ 45} Dr. Bell testified that she noted Melea's status as "guarded" on her notes upon release from recovery because she knew Melea had been anemic to start and they needed to monitor her hemoglobin/hematocrit levels, not because she thought Melea was unstable. She asserted that Melea's red blood cell levels in fact improved after her autoinfusion.
 {¶ 46} Dr. Bell testified that she was notified of Melea's 101.4 degree temperature before 11:00 p.m., and she planned to check on her before midnight. She testified that a fever may be attributed to many things, and that it does not mean that a patient is about to code.
 {¶ 47} Dr. Bell testified that she was paged at 11:00 p.m. and that she ran to Melea's room where she found Melea coughing and emitting wet lung sounds. She testified that she paged Dr. Kittrell, who arrived immediately, and took Melea's vitals. After getting no verbal response and no pulse, she performed CPR and called the code team. The code team transfused Melea with bank blood. Dr. Bell testified that they did so to cover all bases under the assumption that Melea *Page 21 
had begun to bleed again. She testified that the code team tried for one hour to resuscitate Melea, without success.
 {¶ 48} Dr. Bell testified that her initial thought was that Melea died from a pulmonary embolus (blood clot in the lungs), because she was pregnant and had recently flown or because she had recently had surgery, all of which pose the risk of blood clots. She testified, however, that she agrees with the medical examiner's cause of death due to myocarditis. She testified that she disagrees with Mr. Walker's theory that Melea died from hypoxia (blood loss) because there was no blood in her abdomen and, although her hemoglobin level was low, many patients tolerate such a level well. In conclusion, Dr. Bell opined that she and the other medical providers all met the requisite standard of care in regard to their treatment of Melea.
 {¶ 49} Dr. Catherine Kittrell testified that she was the third year resident on call when she was called to the emergency department around 2:00 p.m. on October 27, 2002, regarding a patient with a ruptured ectopic pregnancy. She testified that she discussed with Melea the viability of her pregnancy, the need for surgery, the dangers associated with bleeding, the risk of anemia, and blood transfusions. She testified that she assessed Melea and found her to be stable. She defined an unstable patient as one with abnormal vital signs, severe tachycardia (rapid heart rate), low blood pressure, low urine output, and unable to answer questions. *Page 22 
 {¶ 50} Dr. Kittrell testified that Melea consented to the use of blood products if absolutely necessary, but that she preferred the use of the cell saver. Dr. Kittrell testified that the doctors agreed to use the cell saver to autoinfuse Melea's own blood and monitor her. She testified that the cell saver measures blood loss much more accurately than people do. She testified that she performed part of the surgery and that it went well. She testified that the doctors decided that as long as Melea remained stable, they would not use bank blood products to manage her anemia.
 {¶ 51} Dr. Kittrell testified that Melea was stable on the floor and that the increase in her hemoglobin level from 5.2 to 6.1 was a significant improvement, especially when considering the effects of hemodilution.
 {¶ 52} Dr. Kittrell testified that she is aware that Dr. Eisinger is critical of her because she did not persuade Dr. Wilkof to transfuse Melea. She testified that she does not agree with that criticism because 1) she believes that Dr. Wilkof was medically correct in deciding not to transfuse, 2) the patient was apprehensive about a blood transfusion, and 3) a resident does not have the authority to tell the attending doctor what to do. She testified that, if she believed that Melea needed a transfusion of additional blood, she would have discussed that with Dr. Wilkof. She testified, however, that she believed that Melea did not need blood in addition to the cell saver. *Page 23 
 {¶ 53} Dr. Kittrell testified that she believes that she met the requisite standard of care in this case as a third year resident. She further testified that she has no criticisms of any other doctor or the nurse anesthetist.
 {¶ 54} Dr. Kittrell discussed Melea's urine output. She testified that she is not concerned that the output amounts were not documented in the chart because the nurses often just write the amounts on the patient's door so other nurses can monitor easily. Furthermore, she testified that she knew the output was appropriate because Dr. Bell reported to her that it was. She testified that she was not concerned about the discrepancy in the color of Melea's urine because it is normal for urine to change colors throughout the day. She testified that the first time Melea's urine was documented as "yellow," the urine was likely diluted because of the amount of fluids infused into her system. She testified that the "amber" urine was likely urine that was returning to a more normal color.
 {¶ 55} Dr. Kittrell testified that she concurs in the medical examiner's cause of death because she believes that Melea suffered an acute event. She opined that the ventricular arrhythmia observed when Melea was coding was consistent with myocarditis as a cause of death. She testified that Mr. Walker's theory that Melea bled to death is not accurate because even young patients will show signs of hypoxia; that it does not happen in a matter of minutes. She testified that Melea would have had severe tachycardia with a heart rate in the 130 to 140 range and poor urine output, and she had neither. Further, she disputed the plaintiff's *Page 24 
estimate that Melea lost 2000-3000cc of blood, because it is unreasonable to think that the doctors underestimated the blood loss by 1000-2000cc. She testified that the anesthesiology team and Dr. Wilkof are experienced and estimate blood loss on a daily basis. She emphasized that the cell saver accurately measures blood loss even better than people do.
 {¶ 56} Dr. Kevin Kington is an OB/GYN, who testified that he reviewed the medical records and depositions in this case. He opined to a reasonable degree of medical certainty based on his education and experience that the medical professionals met the standard of care in this case. He had no criticisms of the two residents because their role is to work under the direction and supervision of the attending. He further opined that nothing the medical professionals did or did not do directly or proximately caused Melea's death. He testified that he agrees with the medical examiner's opinion regarding the cause of death as myocarditis. He testified that he disputes Mr. Walker's theory of the case because there is no evidence in the patient's chart to support a finding of death by hypoxia. Specifically, he testified that Melea's clinical course was not representative of the ill effects associated with blood loss or anemia.
 {¶ 57} Dr. Kington testified that, in a case like this, an attempt should be made to transfuse the patient pre-operatively, although blood is not typically transfused until surgery as a matter of practicality. He testified that it takes some time to prepare bank blood for transfusion, and it is not reasonable to delay *Page 25 
surgery in that regard. Accordingly, in this case, he testified that Melea should have received blood during surgery, which she did through the use of cell saver technology. He opined that the administration of cell saver blood was appropriate and met the standard of care because of the concentration of red blood cells.
 {¶ 58} Dr. Kington testified that the post-operative period presents a gray area because the doctors must consider the patient's wishes that she receive blood only if absolutely necessary. He testified that there must be an on-going assessment; where the patient does not want blood products, the doctors must monitor the hemoglobin level and watch for symptoms to determine whether blood is necessary. He testified that Melea did not show any signs of needing a transfusion; therefore, the medical professionals met the standard of care when they did not transfuse her with additional blood.
 {¶ 59} Dr. Kington testified that Melea did not need additional blood post-operatively because her vital signs and urine output indicated sufficient blood volume and because her hemoglobin level was rising. Although he testified that, given the ruptured ectopic pregnancy and initial hemoglobin level of 5.2, Melea could have had an elective transfusion. He asserted that she did not fit into the elective transfusion category, however, because she only agreed to blood products if absolutely necessary.
 {¶ 60} Dr. Kington testified that he disagrees with the plaintiff's theory that the cause of death was hypoxia for several reasons: Melea suffered no massive *Page 26 
post-operative blood loss, she was stable for many hours after surgery, and she did not experience the "progressive, drawn-out course" of symptoms typical in the course of death due to hypoxia. On the other hand, he opined that a cause of death from viral myocarditis was consistent with Melea's clinical course, where the death was a very acute event involving the heart and lungs. He opined that Melea would have died whether or not she had a ruptured ectopic pregnancy because he did not believe that her death was related to blood loss.
 {¶ 61} Dr. Kington acknowledged that a hemoglobin level of 5.2 is low, but not so significant as the number in a vacuum indicates. He reasoned that Melea's level decreased over a long period of time, so her body had accommodated the lower level. He further testified that the normal hemoglobin level for a woman is 10-12 and that Melea's normal level was unknown. Accordingly, he testified that it is not possible to determine the amount of blood loss just from her hemoglobin level. He asserted that it is much more accurate to determine blood loss by measuring that blood from the abdomen. Accordingly, he agreed that Melea lost 1000cc, plus or minus 300cc. He testified that Melea's hemoglobin level indicated a loss of 2500cc of blood only if her level fell within the normal range prior to the bleed. He testified, however, that he could not assume that she lost that amount of blood based on the absence of any corresponding symptoms and the accuracy of the cell saver in measuring blood loss. *Page 27 
 {¶ 62} Dr. Kington testified that he found Dr. Bell's post-operative orders appropriate. He testified that it is standard practice not to document urine output in the patient's chart at the time of monitoring, although the amounts are typically noted in the chart at some time. He opined that there was no breach of the standard of care so long as the nurses were monitoring the urine output, even though the amounts may not have been documented.
 {¶ 63} Dr. George Sterbenz, chief deputy medical examiner for Summit County, testified that he performed Melea's autopsy on October 28, 2002. He testified that a cause of death is a medical reason why someone has died (e.g., cardiovascular disease, gunshot wound), while a manner of death is a medical/legal classification of death (e.g., natural, accidental, homicide). He testified that in determining the cause of death, he conducts a physical examination of the body and reviews the decedent's medical history, medical records and the circumstances of the death. He testified that he is legally required to render an opinion regarding the cause of death within a reasonable degree of medical certainty.
 {¶ 64} Dr. Sterbenz testified that he took samples from 22 distinct parts of Melea's heart, more than most forensic pathologists would consider adequate. He testified that his microscopic examination of the heart showed "focal patchy lymphocytic infiltrates associated with focal myocyte necrosis and fibrosis," diagnostic of focal myocarditis. He defined myocarditis as an inflammation *Page 28 
within the heart muscle associated with injury to the muscle cells. He further described a lymphocyte as a type of blood cell associated with some types of inflammatory reactions not normally found in a healthy heart. He testified that all types of myocarditis can lead to death because of the interruption of the heart's normal electrical conduction system. Dr. Sterbenz disagreed with Dr. Jasnosz' testimony that one must find abundant areas of infiltrations and necrosis to find myocarditis. On the contrary, he testified that any focus is sufficient for such a finding. Here, he testified that Melea's filtration was mild and focal, as opposed to severe and abundant, and presented an accepted mechanism for sudden and unexpected death.
 {¶ 65} Dr. Sterbenz testified that the recut slides reviewed by Dr. Jasnosz were cut from the same block of heart tissue, but deeper. He testified that the absence of the same findings on the recut slides does not change the diagnostic findings elsewhere on the original slides. He testified that he also conferred with Dr. Lisa Kohler, Summit County Medical Examiner, who concurred that Melea's heart showed diagnostic features of myocarditis.
 {¶ 66} Dr. Sterbenz opined that Melea's cause of death was cardiac arrhythmia (abnormal electrical activity) due to myocarditis of probable viral etiology. He testified that he noted the ruptured ectopic pregnancy as a significant contributing condition in recognition of the physical stress associated therewith. He clarified that blood loss alone does not adequately explain the death. Although *Page 29 
a ruptured ectopic pregnancy placed Melea in a subset of the population at higher risk of dying from something like blood loss, Dr. Sterbenz testified that he would not have listed blood loss or the stress of blood loss as the cause of death in the absence of myocarditis because such a cause of death was not representative of the circumstances as they occurred. He testified that Melea's critical event was sudden and unexpected. He testified that due to the myocarditis, and the various stressors which further compromised her system, Melea suffered sudden and unexpected death.
 {¶ 67} Dr. Sterbenz admitted that severe anemia is another physiological stressor which increases the risk of arrhythmia, and he testified that he acknowledged that by noting Melea's ruptured ectopic pregnancy. He testified that the autopsy showed no significant blood in the abdominal cavity after surgery. He testified that he considered the possibility of acute blood loss or anemia as the cause of death, but he rejected it based on his examination.
 {¶ 68} Dr. Leslie Wilkof testified that she was the on-call attending OB/GYN the day Melea presented at the hospital. She testified that she routinely deals with blood loss in patients and has considered and administered blood transfusions, using both bank blood and cell saver technology. She testified that she explained to Melea the risks of receiving and not receiving a transfusion. She testified that Melea was reluctant to receive blood, and that she tries to respect her *Page 30 
patients' wishes in that regard unless there is an overwhelming necessity to transfuse.
 {¶ 69} Dr. Wilkof testified that it is not unusual to see patients with hemoglobin/hematocrit levels in the same range as Melea's due to heavy menstruation or pregnancy and who show no effects. She testified that she herself had a hematocrit level of 16 when she delivered 2 of her own children and she merely took iron to restore the hematocrit to a higher level. She testified that only patients with such low levels who are symptomatic or hemodynamically unstable require blood transfusions. Dr. Wilkof testified that hematocrit/hemoglobin levels are more indicative of a need to transfuse when the patient is actively bleeding.
 {¶ 70} Dr. Wilkof testified that Melea showed no signs of hypoxia or instability pre-operatively. She testified regarding three scenarios: First, if Melea had shown signs of instability, she would have transfused her prior to surgery because anesthesiologists will not render an unstable patient unconscious. Second, if Melea was stable and would readily accept blood, she would have performed the surgery to stop the bleeding and rechecked the hemoglobin/hematocrit levels. If they were still low, she would have transfused then rechecked the levels in a few hours. Third, if the patient were very reluctant to receive a blood transfusion, like in Melea's case, she would perform the surgery to stop the bleeding and would use the cell saver technology to avoid a later need for transfusion. She would then check the patient's levels in 3-4 hours. If the levels were lower or the patient were *Page 31 
unstable (symptomatic), she would transfuse, then recheck the levels after equilibration. In Melea's case, however, her hemoglobin/hematocrit levels increased and she was stable (asymptomatic). Dr. Wilkof characterized Melea's situation as "almost textbook perfect." She testified that the increase in Melea's hematocrit level from 15.8 to 19.1 demonstrated a 20% increase which was very good, especially considering the dilutional effect of the quantity of fluids infused into her system. Dr. Wilkof disagreed with Dr. Eisinger who stated that the hemoglobin/hematocrit levels would be artificially high; rather, she testified that the levels would be artificially low because of hemodilution.
 {¶ 71} Dr. Wilkof testified that Melea was stable during surgery. She testified that the brief decrease in her blood pressure at the time of the incision was expected due to the release in pressure in her abdomen. She testified that she immediately suctioned the blood from Melea's abdomen for reinfusion, clamped the ruptured fallopian tube to stop the bleeding, removed the diseased tube and sutured it, checked for additional bleeding, and finally removed some scar tissue on the remaining healthy fallopian tube to prevent future ectopic pregnancies. She testified that 2 units of additional blood were available in the event that Melea required a transfusion of blood in addition to her own salvaged blood.
 {¶ 72} Dr. Wilkof testified that she suctioned 1000cc of blood from Melea's abdomen and that any additional blood loss was minimal. She testified that Mr. Walker's estimate that Melea lost 2000-3000cc of blood is not accurate because *Page 32 
she did not see that much and the cell saver recovered most of the lost blood and measured it. Dr. Wilkof testified that the cell saver suctioned and recycled blood clots in addition to any unclotted blood.
 {¶ 73} Dr. Wilkof testified that Melea was stable throughout surgery. She testified that Melea produced 100cc of urine during surgery as measured by the anesthesiology team, and that this was a very good output. She testified that Melea was stable immediately after surgery as well, so there was no need to transfuse her with additional blood.
 {¶ 74} Dr. Wilkof testified that she discussed the post-operative orders with Dr. Bell. She testified that Dr. Bell or Dr. Kittrell would have called her if Melea's vital signs registered outside the parameters ordered by Dr. Bell.
 {¶ 75} Dr. Wilkof opined that she and all the other medical professionals met the standard of care in this case. She testified that she, Dr. Kittrell and Dr. Bell were in agreement regarding the decisions made regarding Melea's care and treatment.
 {¶ 76} Dr. Wilkof testified that her initial theory regarding Melea's death was that she suffered anaphylactic shock as a result of an allergic reaction or that she suffered a pulmonary embolism (blood clot). She testified that either situation causes rapid death. She testified that hypoxia could not be considered a reasonable cause of death because that is not the natural course for someone with significant anemia where the bleeding has stopped. In addition, she testified that a *Page 33 
very anemic patient who continues to bleed can be expected to demonstrate a gradual decline, not a crash.
 {¶ 77} Dr. Wilkof testified that she agrees with the medical examiner that Melea died as a result of myocarditis, and that the ectopic pregnancy may have triggered the underlying heart problem. She testified that Melea's clinical course was consistent with the medical examiner's findings, but not consistent with profound anemia leading to arrest because Melea was asymptomatic.
 {¶ 78} Dr. Paul Potter testified that he is an anesthesiologist with an expertise in the area of cell salvaged blood. He testified that the job of an anesthesiologist includes rendering patients unconscious or insensate and managing fluid dynamics pre-, intra-, and post-operatively. He explained the composition of blood as a suspension, comprised of solids (white and red cells) within a liquid (plasma, containing saline, clotting factors and proteins). He explained that a diagnosis of anemia is based on blood volume and oxygen-carrying capacity, while a patient's stability is based on blood pressure, heart rate and oxygen-carrying capacity.
 {¶ 79} Dr. Potter testified that he has vast experience in both autotransfusions and bank blood transfusions. He testified that medical professionals must consider a risk/benefit analysis when deciding whether to transfuse. He explained that transfusions of bank blood carry various risks, including the risk of contracting one of numerous communicable diseases. He *Page 34 
further explained that bank blood is contaminated with foreign tissue, which causes the body to form antibodies as part of an immune response. He testified that the formation of antibodies has potential for long-term implications, including complication in pregnancy between mother and child and complications in attempts to match blood in subsequent transfusions. In making the decision whether or not to transfuse a patient, Dr. Potter testified that the surgeon and anesthesiologist share joint responsibility, although the anesthesiologist has the primary responsibility for monitoring patient stability during surgery.
 {¶ 80} Dr. Potter explained cell saver technology. He testified that the machine suctions and processes blood, including clots. He testified that the blood is anti-coagulated and collected in a reservoir. It is then spun in a centrifugal bowl to separate the red cells. The red cells are then flushed with saline to rid them of contaminants. The compacted red cells and saline then flow into a retransfusion bag for return to the patient's body.
 {¶ 81} Dr. Potter testified that the normal hematocrit level for a female is 30-40. He testified that Melea's level indicated fairly profound anemia which by its number alone would alarm. However, he testified that the medical professionals must look at the patient and how she has accommodated the low level. Dr. Potter testified that despite her low hematocrit level, Melea was asymptomatic, which led him to believe that she bled over a period of days, not hours. He further opined that Melea was chronically anemic before she suffered a *Page 35 
ruptured ectopic pregnancy. He testified that people who have become chronically anemic function well at hematocrit levels between 15 and 20.
 {¶ 82} Dr. Potter testified that Melea would have necessarily lost 2-3 liters of blood to attain a hematocrit level of 15 if she typically fell within the normal range. He testified, however, that only approximately 1300cc of blood was found during surgery. He found this amount credible because the cell saver accurately accounted for 1000cc, 100cc was lost in the abdomen, and no more than 200cc would have been reabsorbed since the time of the rupture. Therefore, he testified, assuming a loss of 1300cc and a resulting hematocrit of 15, Melea's starting hematocrit level would have been in the low twenties. He opined that Melea was chronically anemic; otherwise, she would have lost 60% of her blood volume which would have sent her into shock. He testified, however, that Melea had no signs of shock; specifically, she was not pale or clammy, or experiencing low blood pressure, high heart rate or abnormal mentation. He agreed, however, that a 30-40% volume loss in an acute situation requires a red cell transfusion.
 {¶ 83} Dr. Potter testified that Melea's clinical symptomology indicated that she did not need a blood transfusion pre-operatively because her vitals were stable and her mentation was good. He testified that, although she had slight tachycardia, the increased heart rate was reasonable due to the stress of the situation. He defined instability as vital signs 10-15% above or below the normal range, as well as anything else which would indicate inadequate perfusion, such as *Page 36 
confusion, agitation or incoherence. He emphasized, however, that laboratory values alone are not enough to show instability. Dr. Potter further testified that because the tests conducted in emergency did not show any catastrophic on-going bleeding, there was no need for additional hemoglobin/hematocrit testing before surgery.
 {¶ 84} Dr. Potter testified that the decision to transfuse during surgery is based on oxygen delivery (Melea was hemodynamically stable), the potential for continuing blood loss during surgery (Melea's bleeding was stopped quickly), and whether the patient's blood pressure is dropping (Melea's was not). He opined that it was completely appropriate to administer cell salvaged blood to Melea based on a risk/benefit analysis. He testified that, because she responded appropriately and became very stable, that was all the blood she needed at that particular time. He opined that Melea did not require additional blood in PACU/recovery because clinically she showed no signs of hypovolemia (low blood volume). In addition, he testified that her respiration rate would have been elevated, between 25-35, if she remained profoundly anemic. Instead, he testified that her respiration rate was very good, at 18. Based on her vitals, Dr. Potter expressly disagreed with Dr. Eisinger's opinion that Melea's heart gave out after trying to compensate for her blood loss.
 {¶ 85} Dr. Potter testified that the role of the anesthesiologists ends once the patient is transferred out of PACU. He opined that Dr. Bobinsky and C.R.N.A. *Page 37 
Stafford, as well as the other doctors and nurses, met the standard of care. He further opined that the care provided by these medical professionals did not cause Melea's death. In addition, he opined that Melea's anemia had no bearing on her death because her chronic anemia allowed her to compensate for low hemoglobin levels. He explained that, if there were problems due to anemia over the course of her recovery, she would have exhibited more signs which would have presented in a progressive manner, not suddenly as in this case.
 {¶ 86} Dr. Potter opined that the ruptured ectopic pregnancy was a co-factor in Melea's death but that it was not a significant contributor to her death, based on similar cases he has seen. He further opined that, even assuming that anemia caused Melea's death, an additional transfusion of bank blood would not have made any difference for 3 reasons: 1) a patient only receives 2/3 of the blood originally drawn because of continuing cell death, 2) dead red cells explode, resulting in large amounts of free hemoglobin which is detrimental, and 3) stored blood is not very stable due to 2,3-DPG levels which tell blood cells to aggressively bind oxygen at the lung but decline to release the oxygen at the tissue level. He testified that bank blood may immediately raise hemoglobin levels upon transfusion, but there is no increased functionality for 1 to 2 days.
 {¶ 87} Dr. Theodore Bobinsky is the anesthesiologist, who was called to the operating room to provide anesthesia for Melea. He testified that he has vast experience with anemic patients. He testified that he has been trained to recognize *Page 38 
when a patient needs a blood transfusion; he testified that the decision to transfuse is one made jointly by the surgeon and anesthesiologist.
 {¶ 88} Dr. Bobinsky testified that he noted that Melea's lab sheet indicated very low hemoglobin/hematocrit levels. He testified that he discussed the risks of blood transfusion with Melea and further explained the cell saver autotransfusion process. He testified that Melea agreed to the use of cell saver technology and ultimately agreed to receive additional blood products if necessary.
 {¶ 89} Dr. Bobinsky opined that Melea did not need a blood transfusion prior to surgery because she was stable. He further opined that the standard of care did not require the administration of an additional hemoglobin/hematocrit test prior to surgery because the 45 minutes necessary to complete the test would have inappropriately delayed surgery.
 {¶ 90} Dr. Bobinsky testified that it is the responsibility of the anesthesiologist to monitor a patient's vital signs during surgery. He testified that he would expect an unstable patient to become more unstable as anesthesia is applied, and Melea did not become unstable. He testified that he never had any concerns that Melea needed additional blood during surgery, although he would have transfused her if he believed it was necessary.
 {¶ 91} Dr. Bobinsky testified that he looked into Melea's abdomen during surgery after the cell saver was used, and he noted the abdomen was very dry, with no active bleeding. He disagreed with Mr. Walker's estimate that Melea lost *Page 39 
2000-3000cc of blood because that was far too much blood to underestimate, given the cell saver measurement and C.R.N.A. Stafford's calculations.
 {¶ 92} Dr. Bobinsky testified that Melea was stable in PACU, with excellent vitals, and discharged to the floor upon meeting all criteria. He testified that Melea's vital signs indicated no need for additional blood while in recovery. He testified that the job of anesthesiology is done once the patient is released from PACU to the floor, although the nurse anesthetist will check on the patient the next day to see how she is doing.
 {¶ 93} Dr. Bobinsky testified that he met the standard of care required in this case. He asserted that the jury should believe him over Mr. Walker's experts because his training is equal to or better than the other experts and because he was present to observe this case. He opined that C.R.N.A. Stafford, as well as all the other medical professionals, met the standard of care. He opined that the care provided by the medical professionals did not directly or proximately cause Melea's death. He further opined that anemia did not directly or proximately cause Melea's death because a much slower decline in her status would have been evident. He testified that, even though younger patients tolerate such adversity better, once they reach an intolerable level, they slowly decline. He added that Melea's respiratory rate in PACU would have been faster if she were suffering adverse effects of anemia. *Page 40 
 {¶ 94} On the other hand, Dr. Bobinsky testified that Melea's clinical picture was consistent with arrhythmia. He agreed that anemia can cause arrhythmia in certain patients, but in the case of a 24-year old healthy patient with clean coronary arteries, there must be significant anemia before lack of oxygenation would cause arrhythmia. He testified that the peripheral blood smear report from pathology does not show acute anemia because that is impossible to determine from merely one slide. He testified that Melea was likely anemic prior to the events in Jamaica. He emphasized, however, that Melea's vital signs were good and her pulse oximeter readings were excellent, demonstrating that the important organs were appropriately saturated with oxygen.
 {¶ 95} C.R.N.A. Roberta Stafford is a certified registered nurse anesthetist. She testified that her job entails seeing the patient pre-operatively, assessing the physical history, tubing the patient in the operating room, inducing the anesthetic, maintaining the patient's stability, waking the patient, taking the patient to recovery, giving the recovery room nurse a report about the patient's condition, and signing off on the case. She testified that she works with a doctor at all times. She testified that she performed these duties in regard to Melea.
 {¶ 96} C.R.N.A. Stafford testified that she was aware of Melea's low hemoglobin/hematocrit levels and she was concerned that she might need blood. At a hemoglobin level of 5.2, she testified that she expected Melea to be pale, *Page 41 
unable to sit up, profusely tachycardic, and very symptomatic, but she exhibited none of those signs.
 {¶ 97} C.R.N.A. Stafford testified that Melea was never unstable during the surgery. She testified that she never believed that Melea needed additional blood during surgery because patients are transfused on the basis of vital signs and presentation, and Melea was stable and had no problem with oxygenation. She testified that she would have advised a transfusion if she believed it was indicated, specifically where Melea manifested clinical symptoms. She testified, in her experience, the body gives signs to indicate that there is inadequate perfusion of oxygen to the organs, and patients cannot mask those signs, even when they are young and healthy. She testified that she has the requisite training and experience to judge whether a blood transfusion is necessary.
 {¶ 98} C.R.N.A. Stafford testified that she calculated that Melea lost 1000cc of blood based on the amount measured in the cell saver canister after salvage, the amount on the drapes and floor around the patient (negligible), the amount on the tapes/sponges, and the amount in the disposable canister for discarded blood. She testified that 700cc were collected in the cell saver and 200cc from the other four sites. She testified that a blood loss of 2000-3000cc was impossible because she was there and saw the amount of blood loss and that larger amount of blood could not physically fit in Melea's belly. *Page 42 
 {¶ 99} In regard to Melea's urine, C.R.N.A. Stafford testified that nurses generally look at volume in the catheter bag and do not necessarily document the amount if they are not ordered to do so. She testified that Dr. Bell issued the typical order, merely that the doctors be notified if the urine output falls outside the established parameters. She further testified that the identification of urine color is very subjective. She opined that Melea's document "yellow" urine was diluted, while the later "amber" urine was what would be considered normal.
 {¶ 100} C.R.N.A. Stafford testified that Melea did not need additional
blood in recovery. She testified that she never considered Melea's condition life-threatening. She opined that she met the standard of care required in this case and that she did nothing to put Melea's life in danger. She emphasized that she has performed these types of duties and made these types of decisions every day for 20 years.
 {¶ 101} The jury in this case found that none of the defendants were negligent, and it therefore did not reach the issue of proximate cause.
 {¶ 102} In this case, the trial court stated:
 "These issues were thoroughly litigated at trial. * * * All of these witnesses testified as to their qualifications, credentials and relevant experience. The jury did not lose its way if they found the defense witnesses to be more credible in regards to blood transfusion.
 "While both sides' doctors presented competent and credible testimony on the matter, the Court cannot find that the jury lost their way and created a miscarriage of justice by finding for the defendants after the testimony and evidence presented at trial. *Page 43 
 "* * *
 "The Court hereby finds that the jury's verdict was in accordance with the evidence presented at trial. Consequently the verdict is not shocking to reasonable sensibilities nor does it indicate the jury lost its way."
 {¶ 103} In reviewing the trial court's denial of Mr. Walker's Civ.R. 59(A)(6) motion for a new trial, it is not this Court's duty to directly review whether the judgment was against the manifest weight of the evidence. Prince at ¶ 34. Rather, we need only review the trial court's decision on that matter for an abuse of discretion. Id. Upon a review of the record, there is competent, substantial evidence to support the verdict. Id. at ¶ 35. The trial court appropriately abstained from interfering with the verdict where it was not clear that the jury had reached a seriously erroneous result. Id. Accordingly, the trial court did not abuse its discretion by denying the motion for a new trial. Mr. Walker's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED BY ALLOWING EVIDENCE REGARDING MELEA WALKER'S ALLEGED STATUS AS A JEHOVAH'S WITNESS AS SUCH EVIDENCE WAS NOT SUPPORTED BY THE EVIDENCE AND FURTHER WAS CLEARLY PREJUDICIAL TO HER CASE."
 {¶ 104} Mr. Walker argues that the trial court erred by allowing evidence at trial regarding Melea's alleged status as a Jehovah's Witness. This Court disagrees. *Page 44 
 {¶ 105} Mr. Walker filed a motion in limine to exclude such evidence. The trial court denied the motion. During voir dire, plaintiff's counsel made the following statements to the prospective jurors:
 "[T]here's going to be testimony in this case about Melea Walker and her religious beliefs, and there will be mentioned that she claimed to be or said that she was a Jehovah's Witness. Does anybody have any feeling one way or the other when you hear about a Jehovah's Witness, does that prompt anything positive, negative, or you are basically neutral about all of that?"
 {¶ 106} It has been held:
 "The established rule in Ohio is that the grant or denial of a motion in limine is not a ruling on the evidence. State v. Grubb (1986), 28 Ohio St.3d 199, 200-201. The ruling is preliminary, thereby requiring the parties to raise specific evidentiary objections at trial in order to permit the trial court to consider admissibility of the evidence in its actual context. Haslam v. Russell, 7th Dist. No. 03 MO 3, 2003-Ohio-6724, at ¶ 51, citing Grubb, 28 Ohio St.3d at 202. As a result, the failure to object to the evidence at trial waives the right of the objecting party to raise the court's ruling on the preliminary motion as error on appeal. Id., citing Grubb, 28 Ohio St.3d at 202-203." Pleasant v. EMSA Correctional Care, Inc., 10th Dist. No. 03AP-1161, 2004-Ohio-4554, at ¶ 21.
 {¶ l07} In this case, Mr. Walker never objected at trial to the presentation of any evidence regarding Melea's alleged status as a Jehovah's Witness. In fact, Mr. Walker was the first party to address Melea's alleged religious beliefs before the jury. Accordingly, this Court finds that Mr. Walker has forfeited his ability to raise this issue on appeal due to his failure to preserve the issue by objecting to the admission of such evidence at trial. Mr. Walker's second assignment of error is overruled. *Page 45 
 III. {¶ l08} Mr. Walker's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to appellant.
SLABY, J., WHITMORE, J., CONCUR
[1] Mr. Walker did not sue the emergency department personnel or allege that the care and treatment that Melea received while in emergency was below the standard of care. *Page 1