OPINION
{¶ 1} Defendants-appellants, World Harvest Church ("WHC") and Richard Vaughan, appeal from a judgment of the Franklin County Court of Common Pleas in favor of plaintiffs-appellees, Michael Faieta, Lacey Faieta, and their minor son, A.F. Because *Page 2 
(1) the trial court did not abuse its discretion in its evidentiary rulings, (2) the general verdict forms and interrogatories submitted to the jury are not plainly erroneous, (3) sufficient evidence supports the jury's verdicts against WHC, and (4) the trial court did not err in imposing the punitive damages against WHC, we affirm the trial court's judgment.
I. Procedural History {¶ 2} On May 30, 2006, plaintiffs filed a complaint alleging defendant Vaughan, an employee of defendant WHC's Preparatory School ("school"), physically abused plaintiff A.F. during the afternoon of January 17, 2006 while the two and one-half year old boy was in Vaughan's care in WHC's daycare program. Plaintiffs specifically alleged that Vaughan struck and severely beat A.F. with an object that left plainly visible marks, cuts, and contusions on the child's back, buttocks, and thighs. Plaintiffs asserted claims of battery and intentional infliction of emotional distress against Vaughan and claims of negligent supervision and intentional infliction of emotional distress against WHC.
 {¶ 3} On October 18, 2007, following a seven-day jury trial, the jury returned verdicts in favor of plaintiffs against both defendants. The jury awarded plaintiffs compensatory damages of $134,865 and punitive damages of $100,000 against Vaughan, and compensatory damages of $764,235 and punitive damages of $5 million against WHC. The jury also found plaintiffs entitled to attorney fees from WHC.
 {¶ 4} After the trial, plaintiffs filed a motion for prejudgment interest, and defendants filed combined motions for judgment notwithstanding the verdict ("JNOV"), new trial, and/or remittitur. In a May 6, 2008 written decision, the trial court denied all the post-trial motions but, upon applying statutory caps to the compensatory and punitive damages awards, reduced plaintiffs' compensatory damages award by $350,000 and *Page 3 
limited their punitive damages award to $1,628,470. Concluding application of R.C. 2315.21(D)(2)(b) exempted Vaughan from paying the $100,000 in punitive damages awarded against him, the trial court assessed all the punitive damages against WHC pursuant to its joint and several liability. Faieta v. World Harvest Church, 147 Ohio Misc.2d 51,2008-Ohio-3140 ("Faieta"). In accord with the jury's verdict, determining WHC is liable for plaintiffs' attorney fees, the court awarded fees in the amount of $693,861.87. On May 23, 2008, the trial court entered a final judgment of $2,871,431.87 in favor of plaintiffs. WHC is solely liable for $2,789,066.87 of the judgment; Vaughan is primarily liable, and WHC secondarily liable, for the remaining $82,365 in compensatory damages entered against Vaughan.
II. Assignments of Error {¶ 5} Defendants appeal, assigning seven errors:
 I. The Trial Court Erred In Failing To Grant Judgment Notwithstanding The Verdict On Plaintiffs' Claims of Intentional Infliction Of Emotional Distress And Negligent Supervision Against Defendant World Harvest Church ("WHC") Because There Was Insufficient Evidence To Support Such Claims.
 II. The Trial Court Erred In Awarding Punitive Damages And Attorney Fees Against WHC.
 III. The Trial Court Erred In Refusing To Give A Proper Jury Instruction Regarding Punitive Damages.
 IV. The Trial Court Committed Several Erroneous And Prejudicial Evidentiary Rulings, And Thus A New Trial Is Required.
 V. The Jury's Verdicts Against Defendant Vaughan For Battery And Intentional Infliction Of Emotional Distress Were Against The Manifest Weight Of The Evidence. *Page 4 
 VI. The Trial Court Committed Plain Error In Its Use Of Jury Interrogatories And General Verdict Forms That Failed to Require The Jury To Award Separate Damages For Each Individual Plaintiff From Each Individual Defendant.
 VII. The Trial Court Erred In Applying R.C. § 2315.21(D) By Awarding Punitive Damages Against WHC In An Amount Two Times The Total Compensatory Damages Awarded Rather Than The Two Times The Capped Compensatory Damages That Could Be (And Were) Awarded Against WHC Pursuant To R.C. § 2315.18.
III. First Assignment of Error — Denial of Motion for JNOV on Claimsagainst WHC {¶ 6} Defendants' first assignment of error asserts the trial court erred in denying their JNOV motion. Defendants do not challenge the trial court's decision to deny the JNOV motion on the battery and intentional infliction of emotional distress claims against Vaughan, but they contend insufficient evidence supports the jury's verdicts on plaintiffs' negligent supervision and intentional infliction of emotional distress claims against WHC. Although defendants concede WHC is secondarily liable as Vaughan's employer for the $82,265 judgment against Vaughan, defendants asserts the trial court erred in entering judgment against WHC in any greater amount because plaintiffs presented insufficient evidence to support any independent tort claim against WHC.
 {¶ 7} In reviewing a decision denying a motion for JNOV, an appellate court applies the same test used in reviewing a motion for a directed verdict. Texler v. D.O. Summers Cleaners Shirt Laundry Co. (1998),81 Ohio St.3d 677, 679. When considering a motion for a directed verdict, a court must construe the evidence most strongly in favor of the party against whom the motion is addressed. Civ. R. 50(A). A motion for directed verdict raises questions of law, not factual issues, because it tests the legal sufficiency of the evidence for purposes of presenting the case to the jury. Texler, *Page 5 
supra, at 679-680; Wagner v. Roche Laboratories (1996),77 Ohio St.3d 116, 119. The court's disposition of the motion does not involve weighing evidence or the credibility of the witnesses. Id. The court must deny the motion where any evidence of substantial probative value favors the nonmoving party, and reasonable minds might reach different conclusions on that evidence. Id.; Strother v. Hutchinson (1981),67 Ohio St.2d 282, 284-285.
 {¶ 8} Preliminarily, the record reflects that the jury rendered general verdicts in favor of plaintiffs against both defendants. In answers to interrogatories that accompanied the verdict forms, the jury found by a preponderance of the evidence that (1) Vaughan committed a battery against A.F. that was the proximate cause of damages to "the Faietas" (Interrogatory 1); (2) "Vaughan and/or [WHC] intentionally inflicted serious emotional distress on the Faietas" that proximately caused damages to them (Interrogatory 2); and (3) WHC was negligent in supervising its employee Vaughan, and its negligent supervision was the proximate cause of damages to "the Faietas" (Interrogatory 3).
 {¶ 9} Interrogatory 2 is inconclusive in addressing whether WHC, Vaughan, or both intentionally inflicted serious emotional distress on plaintiffs. For purposes of resolving the assigned error, we presume the jury found against both Vaughan and WHC on plaintiffs' claims for intentional infliction of emotional distress. See Centrello v.Basky (1955), 164 Ohio St. 41, at paragraph four of the syllabus;Hampel v. Food Ingredients Specialties, Inc. (2000), 89 Ohio St.3d 169,185, citing H.E. Culbertson Co. v. Warden (1931), 123 Ohio St. 297, 303. Additionally, because the jury entered a general verdict *Page 6 
against WHC, the jury's verdict will be upheld if legally sufficient evidence supports either of plaintiffs' claims against WHC. Id.
A. Plaintiffs' Negligent Supervision Claim against WHC
 {¶ 10} Plaintiffs claimed at trial that while A.F. was in Vaughan's sole care in a daycare class at WHC on January 17, 2006, Vaughan struck A.F. with a ruler or other object that left red marks, welts, linear stripes, and abrasions on the child's back, buttocks, upper thighs, and penis. Defendants do not contest the jury's finding that Vaughan committed a battery against A.F. that resulted in the child's injuries.
 {¶ 11} In order to prevail on their claim of negligent supervision against WHC, plaintiffs had to establish (1) the existence of an employment relationship between WHC and Vaughan, (2) Vaughan was incompetent, (3) WHC had actual or constructive knowledge of Vaughan's incompetence, (4) Vaughan's act or omission caused injuries to plaintiff(s), and (5) WHC's negligence in hiring, supervising, or retaining Vaughan was a proximate cause of the injuries to plaintiff(s).Browning v. Ohio State Hwy. Patrol, 151 Ohio App.3d 798, 2003-Ohio-1108, at ¶ 63-67; Harmon v. GZK, Inc., Montgomery App. No. 18672, 2002-Ohio-545; see, also, Simpson v. Ohio Reformatory for Women, Franklin App. No. 02AP-588, 2003-Ohio-988, at ¶ 21. Here, Vaughan's alleged "incompetence" was a propensity to physically harm or abuse children in his care.
 {¶ 12} Defendants contest only the third element, the key to which is showing the employer knew or should have known of the employee's criminal or tortious propensity. Byrd v. Faber (1991), 57 Ohio St.3d 56,62; Browning, at ¶ 63. Defendants contend the evidence at trial failed to demonstrate WHC knew or should have known of Vaughan's *Page 7 
alleged propensity to physically harm children because the first and only allegations that Vaughan abused a child were made after the January 17, 2006 incident involving A.F.
 {¶ 13} Defendants acknowledge evidence of a child previously being injured while in Vaughan's care, when a boy, Z.C, was hurt on October 13, 2005 while playing with another boy in the same daycare classroom as A.F. Defendants, however, claim plaintiffs presented no evidence that WHC was actually aware or put on notice that the incident involving Z.C was anything more than an accident. Defendants contend WHC therefore had no duty to investigate the cause of Z.C.'s injury or to more aggressively supervise Vaughan after Z.C. was injured.
 {¶ 14} When construed most strongly in favor of plaintiffs, the evidence relevant to the negligent supervision claim reflects that in August 2005, Michael and Lacey Faieta enrolled their two-year-old son, A.F., and their six-year-old daughter, K.F., in WHC's school. A.F. was enrolled in the "Cuddle Care" program for children two to three years old. The Cuddle Care classroom had a morning teacher, Kendra Jones, and an afternoon teacher, Na'Koshia Banks. In the early fall of 2005, five children were enrolled in the morning Cuddle Care class, and four children were enrolled in the afternoon class. In October 2005, one of the children, Z.C, stopped coming to the school after he was seriously injured in the Cuddle Care classroom while under Vaughan's sole care.
 {¶ 15} From spring 2005 until May 2006, WHC employed Vaughan, who was then approximately 58 years old, to perform various tasks at the school. During the same period WHC employed him at the school, Vaughan also worked for FedEx on the midnight shift and helped his wife clean houses during the daytime. Before he began employment with WHC in 2005, Vaughan worked for numerous employers, including a *Page 8 
telephone company, a cemetery, two mortgage companies, Target, and Wal-Mart; he also worked as a volunteer in juvenile detention centers and prisons.
 {¶ 16} In August 2002, Vaughan enrolled in WHC's Bible College and began working for WHC as an accounting clerk. Although WHC terminated his employment in November 2002 for performance-related reasons, Vaughan continued to attend classes. In April or May 2005, WHC re-hired Vaughan to work as a substitute teacher on an "as needed" basis in the school's lower division, which included children in the nursery through sixth grade.
 {¶ 17} During plaintiffs' case-in-chief, Vaughan admitted he had no idea what WHC's policy was on corporal punishment; he also admitted he hit his own children with a large spoon, such as a ladle, to discipline them. Although Vaughan was not a licensed teacher and never had a job that required him to work with young children, WHC assigned Vaughan the task of supervising young children, usually placing him in the "Extended Care" program for children in Kindergarten through sixth grade. Because of ratio requirements and the large number of children in the Extended Care program, at least one other adult always was working with Vaughan.
 {¶ 18} On only two instances did WHC assign Vaughan to the Cuddle Care classroom: October 13, 2005 and January 17, 2006. On October 13, 2005, three-year-old Z.C. suffered a fractured skull in the Cuddle Care classroom while Vaughan was the only adult present. On January 17, 2006, A.F. exhibited fresh abrasions, welts, and red marks on his body after being in Vaughan's sole care in the Cuddle Care classroom that day.
 {¶ 19} According to Z.C.'s mother, when she picked up Z.C. from the Cuddle Care classroom at approximately 6:00 p.m. on October 13, 2005, he was waiting anxiously for *Page 9 
her at the classroom door with his left eye swollen shut, his nose draining, and his face red and puffy. Vaughan, the only adult in the room, was not consoling Z.C. and did not offer Z.C.'s mother any explanation regarding Z.C.'s condition. When Z.C.'s mother asked Vaughan what had happened to Z.C, Vaughan hesitantly told her another boy, E.Y., had pushed Z.C. She asked Vaughan if anyone had paperwork or documentation regarding the incident, but he replied "no." When she told Vaughan that she needed to take Z.C. to Children's Hospital, Vaughan told her repeatedly that Z.C. was "fine." Over Vaughan's protestations, she took Z.C. to Children's Hospital, where he was diagnosed with a fractured skull and concussion and was held overnight for observation. The next day, Z.C.'s mother spoke with Cathy Cornell, the director of the Cuddle Care program, and told her what had happened to Z.C. Cornell confirmed she had multiple telephone and e-mail conversations with Z.C.'s mother regarding Z.C.'s injury.
 {¶ 20} Vaughan's trial testimony regarding the incident was inconsistent both with previous accounts he gave and with the testimony of other witnesses. Vaughan purportedly completed an incident report regarding Z.C.'s injuries in which he explained that Z.C. "bumped heads" or collided with E.Y. while the boys were playing in the Cuddle Care classroom. Cornell testified she received Vaughan's incident report the morning after the October 13, 2005 incident. Z.C.'s mother testified she asked Cornell for a copy of any documentation relating to Z.C.'s injuries, but WHC never provided her with an incident report or any other documentation regarding the injuries to her son. Cornell indicated Z.C.'s mother never asked for a copy of the incident report.
 {¶ 21} According to the evidence, WHC never informed the parents of the other children in the Cuddle Care classroom that one of the children had received a severe *Page 10 
injury. Notably, despite WHC's apparent knowledge, through Cornell, that Z.C. had been seriously injured as the result of allegedly "bumping heads" with E.Y., no one at WHC ever told E.Y.'s parents he was involved in the incident with Z.C, and no one at WHC ever inquired about any possible injuries to E.Y. E.Y.'s father insisted his son had not collided with Z.C. and had not been injured in any incident with Z.C.
 {¶ 22} The record also indicates that although its administration knew Z.C. was seriously injured while in Vaughan's sole care on October 13, 2005, WHC conducted no investigation of the incident, did not make further inquiries of Vaughan concerning the matter, did not provide him with further training to prevent serious injury from occurring to another child, and, most importantly, did not change how it supervised Vaughan after the incident. Approximately three months later, the very next time WHC permitted Vaughan to be alone with the young children in the Cuddle Care classroom, Vaughan physically abused A.F.
 {¶ 23} Based on such evidence, the jury reasonably could infer that the circumstances surrounding Z.C.'s injury were suspicious: he received a skull fracture and concussion when he purportedly "bumped heads" with another boy who suffered no apparent injury. Moreover, not only did WHC's witnesses provide inconsistent and contradictory testimony surrounding the incident, but WHC failed to investigate the incident, to provide the incident report to Z.C.'s mother upon her request, and to inform any of the other Cuddle Care parents about the serious injury to Z.C. With that evidence, the jury reasonably could conclude WHC knew or strongly suspected that Vaughan had something to do with Z.C.'s serious injury but nevertheless again allowed Vaughan, without further training or more supervision, to be the sole care provider for the young *Page 11 
children. Because reasonable minds could have reached different conclusions on whether WHC knew or should have known that Vaughan had a propensity to physically harm children, the trial court properly denied defendants' motion for JNOV on the negligent supervision claim.
B. Plaintiffs' Intentional Infliction of Emotional Distress Claimagainst WHC
 {¶ 24} A claim for intentional infliction of emotional distress exists only where a person, through extreme and outrageous conduct, intentionally or recklessly causes serious emotional distress to another. Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369, at syllabus, 374, citing Restatement of the Law 2d, Torts (1965) 71, Section 46(1). To establish their claim for intentional infliction of emotional distress against WHC, plaintiffs had to show that WHC, through its agents (1) intended to cause emotional distress, or knew or should have known that its actions would result in serious emotional distress, to plaintiff(s) (2) by engaging in extreme and outrageous conduct (3) which proximately caused serious emotional distress to plaintiff(s). Phung v.Waste Mgt, Inc. (1994), 71 Ohio St.3d 408, 410.
 {¶ 25} Defendants assert the evidence in the record does not demonstrate that WHC committed any "extreme and outrageous" acts that caused "serious emotional harm" to plaintiffs. To be "extreme and outrageous," WHC's conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Yeager, supra, at 375. "Serious emotional distress" goes "beyond trifling mental disturbance, mere upset or hurt feelings" and "may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental *Page 12 
distress engendered by the circumstances of the case." Paugh v.Hanks (1983), 6 Ohio St.3d 72, 78.
1. WHC's Conduct after A.F.'s Injuries
 {¶ 26} To put into context WHC's conduct after A.F.'s injuries, we first briefly summarize the circumstances surrounding A.F.'s injuries, construing the evidence and all reasonable inferences in plaintiffs' favor. A.F. was potty trained and therefore not susceptible to diaper rash, and he had no history of allergies, sensitive skin, or rashes. He had no marks on his body either when he was dropped off at the Cuddle Care classroom on the morning of January 17, 2006 or later, when his morning teacher left for the day at 1:00 p.m. Shortly before 6:00 p.m., Michael Faieta picked up his daughter and then picked up A.F. in their respective classrooms. A.F. was in the Cuddle Care classroom alone with Vaughan, who had taken over for the afternoon teacher sometime after 4:00 p.m. According to Mr. Faieta, A.F. was anxious and upset, his eyes were red, and he clung to his father's side as his belongings were gathered. Vaughan did not give Mr. Faieta any paperwork or say that A.F. had experienced any problems that day, and he did not indicate he had seen any sort of rash or other marks on A.F.'s body.
 {¶ 27} Upon their using the restroom on the way out of the building, Mr. Faieta observed the numerous fresh cuts, welts, and red marks on A.F.'s back, buttocks and thighs. The marks were linear and consistent with being hit with a ruler. In the car on the way home approximately an hour later, A.F. told his father that Vaughan had "spanked" him with a "knife." At home, upon being shown pictures of various objects, A.F. pointed to a ruler as the object used to "spank" him. After A.F.'s mother, Lacey Faieta, arrived home and looked at the marks on A.F., she spoke with their pediatrician and the police, who *Page 13 
advised her to take A.F. to Children's Hospital. The emergency physicians at Children's Hospital found A.F.'s injuries to be consistent with physical abuse, and the matter was forwarded to Franklin County Children Services ("FCCS") and the Columbus Police Department ("CPD") for investigation.
 {¶ 28} At approximately 11:00 a.m. the next morning, Cathy Cornell, the director of the Cuddle Care program, received a telephone call from an investigator with FCCS who told her of allegations that A.F. had been physically abused. Approximately an hour later, Michael and Lacey Faieta arrived at WHC. They first met with Cornell, who informed them she had already begun investigating the matter and that neither Vaughan nor any other teacher had seen any marks on A.F. the previous day. When she was shown photographs taken of A.F.'s injuries the previous evening, Cornell was "shocked" and provided no explanation for the injuries.
 {¶ 29} The Faietas also briefly met with Kendra Jones, A.F.'s morning teacher. Jones testified the Faietas showed her the photographs of A.F.'s injuries and inquired whether she had an idea what might have caused them. No evidence suggests that at any time during their visit to WHC the Faietas were disruptive or that they accused WHC or its employees of wrongdoing. All of the evidence demonstrates the Faietas were only seeking information that would help them identify the source of the injuries to A.F.'s body.
 {¶ 30} Before leaving WHC, the Faietas attempted to schedule a meeting with Cuddle Care teachers and WHC's administrators to discuss A.F.'s injuries. Beth Ann Gifford, WHC's Human Resources Director, stressed that such an appointment made through "the proper chain of command" would have been an appropriate method for the Faietas to address their concerns. When, however, Lacey Faieta returned to WHC two *Page 14 
days later and attempted to meet and discuss the matter with Jack Johnson, WHC's headmaster, he refused, telling her he had been advised not to speak with the Faietas. The next week WHC sent the Faietas a letter ordering them not to come on the property and threatening them with criminal prosecution for trespass if they returned to the school. The letter contained no exceptions and provided the Faietas with no means to schedule any further meetings with WHC personnel. The Faietas received no further communication from WHC.
 {¶ 31} Gifford investigated the matter on behalf of WHC. She met with Vaughan and other employees before FCCS or CPD could interview them, and she did not tell them not to discuss the matter among themselves. Gifford admitted that her focus in conducting the investigation was not to make sure the children in the Cuddle Care program were safe but, instead, "to protect our employees." The evidence demonstrates that neither she nor anyone else at WHC asked Vaughan whether he had spanked or hit A.F. Gifford never interviewed or attempted to obtain any information from the Faietas regarding A.F.'s injuries, and no one at WHC notified other parents of the abuse allegations or of A.F.'s injuries.
 {¶ 32} Gifford instructed Cornell to prepare a notice, disseminated to all parents of children in the Cuddle Care class a few days after A.F. was injured, that the children had been exhibiting a "rash." It was the first time WHC had ever issued such a notice. No evidence in the record indicates any of A.F.'s classmates or any other children at WHC had ever suffered a rash similar to the marks on A.F.'s body. Similarly, no evidence suggests WHC ever identified the sources of the children's purported "rashes" or took any steps to prevent further outbreaks. *Page 15 
 {¶ 33} From the evidence presented at trial, the jury reasonably could conclude that WHC engaged in a concerted effort to "cover up" what had happed to A.F. on January 17, 2006. Immediately after WHC became aware of the allegations of physical abuse, Gifford spoke with WHC's employees and allowed them to coordinate their stories before the formal FCCS and CPD investigations began. From that evidence, the jury could reasonably infer that WHC attempted to hinder the FCCS and CPD investigations. Moreover, although no evidence reflects that any other child at WHC ever had a skin condition similar to the marks on A.F.'s body, WHC attempted to characterize A.F.'s injuries merely as a "rash." The jury could reasonably infer from Gifford's testimony that WHC's primary objective in undertaking the investigation was to protect its employees, not to ensure the safety of the young children in its care.
 {¶ 34} The jury could also infer from the evidence that WHC intended to thwart the Faietas' inquiry and prevent them from learning what happened to A.F.: WHC's headmaster refused to meet with them, and WHC by letter threatened the Faietas with prosecution if they returned to WHC to seek information. The letter itself is evidence of an outrageous act, having been sent at a time when the Faietas were trying to learn what had happened to their battered young son. Construing the evidence in plaintiffs' favor and giving plaintiffs the benefits of all reasonable inferences, we conclude the jury could reasonably find that WHC's conduct was "extreme and outrageous" under the facts of this case. *Page 16 
 2. Serious Emotional Distress to Plaintiffs
 {¶ 35} When the evidence is construed in plaintiffs' favor, and plaintiffs are given the benefit of all reasonable inferences, the evidence is sufficient to allow the jury to find that WHC's conduct caused "serious emotional distress" to plaintiffs.
 {¶ 36} Both of A.F.'s parents, his extended family, and Dr. Theresa Diserio, A.F.'s treating psychologist, testified to the extreme emotional distress A.F. suffered as a result of the battery. Prior to the incident on January 17, 2006, A.F. was a happy, easy-going, content child who was independent, was fully potty trained, did not mind being alone, and shut the door when he went to the bathroom. After the incident, A.F.'s personality changed. He was often unhappy, he became frantic if separated from his parents or other family members, he was fearful of being in a room alone, he was clingy and wanted to be held, he wet the bed, and he would not shut the door when he went to the bathroom. Dr. Diserio opined that A.F. was suffering from post-traumatic stress disorder that a traumatic incident caused.
 {¶ 37} The evidence also demonstrates that Michael and Lacey Faieta suffered serious emotional harm because of A.F.'s battery. Michael Faieta testified that seeing the fear in A.F. not only had a lasting effect on the family, but the period of time after January 17, 2006 was a "tumultuous time for the family in terms of what was gong on and trying to get answers and not having much success, specifically, with the school." (Tr. II, 148, 151-152.) Lacey Faieta was "at a loss," "a wreck," "crying," and "in no position for my kids to see me." She became fearful of leaving A.F. with anyone other than family members, so she gave up her career and stayed home to care for him. Mrs. Faieta testified "this broke us up incredibly, broke our hearts and we had a lot of healing that *Page 17 
needed to be done." (Tr. IV, 129.) In addition to counseling from Dr. Diserio, Michael and Lacey sought and received counseling from a family therapist.
 {¶ 38} Because the evidence demonstrated that WHC engaged in extreme and outrageous conduct that caused serious emotional distress to plaintiffs, the trial court properly denied defendants' JNOV motion on the claim against WHC for intentional infliction of emotional distress. Moreover, because sufficient evidence supports the jury's verdict against WHC on plaintiffs' claims of negligent supervision and intentional infliction of emotional distress, we overrule defendants' first assignment of error.
IV. Second and Third Assignment of Error — Punitive Damages againstWHC {¶ 39} Defendants' second and third assignments of error are interrelated and accordingly will be addressed together. In them, defendants assert (1) the trial court erred in imposing any punitive damages against WHC, and (2) because no basis exists for awarding punitive damages against WHC, either directly or vicariously, the court erred in awarding attorney fees against WHC.
 {¶ 40} The trial court found that plaintiffs are entitled to punitive damages from WHC of $1,528,470; the amount represented the jury's punitive damages award against WHC after the trial court applied R.C. 2315.21(D)(2)(a)'s statutory cap to the $5 million amount awarded to plaintiffs from WHC specifically. The trial court also found that judgment should be entered against WHC for an additional $100,000 in punitive damages based upon WHC's vicarious liability.
 {¶ 41} Punitive damages are recoverable from a defendant in a tort action if (1) "the actions or omissions of that defendant demonstrate malice" or (2) "defendant as principal or master knowingly authorized, participated in, or ratified actions or omissions *Page 18 
of an agent or servant that so demonstrate." R.C. 2315.21(C). A party seeking punitive damages must prove entitlement to them by clear and convincing evidence. R.C. 2315.21(D)(4); Estate of Schmidt v.Derenia, 158 Ohio App.3d 738, 2004-Ohio-5431, at ¶ 12. Defendants contend no evidence, much less clear and convincing evidence, demonstrates WHC acted with the requisite malice or knowingly authorized, participated in, or ratified Vaughan's alleged physical abuse of A.F.
A. WHC's Actual Malice
 {¶ 42} Malice in the context of punitive damages is defined as either (1) a state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of others that has a great probability of causing substantial harm. Preston v. Murty (1987), 32 Ohio St.3d 334, at syllabus. "[A]ctual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross." Villella v. Waikem Motors, Inc. (1989), 45 Ohio St.3d 36, 37.
 {¶ 43} At trial, plaintiffs presented sufficient evidence of malice in WHC's acts or omissions and, in particular, evidence that WHC consciously disregarded the well-being and safety of A.F. and the other young children in its care. The evidence demonstrates WHC (1) failed to ensure that Vaughan knew its corporal punishment policy, (2) failed to investigate the serious injury to Z.C. while in Vaughan's sole care, (3) failed to increase its supervision and training of Vaughan after Z.C. was seriously injured, (4) failed to ensure that Vaughan was not left alone with the Cuddle Care children after Z.C. was seriously injured in his sole care, (5) failed to adequately investigate A.F.'s injuries and the allegations of physical abuse against Vaughan, (6) failed to notify the parents of other *Page 19 
children in the Cuddle Care classroom that children in the classroom were seriously injured, and (7) failed to notify the Cuddle Care parents when allegations of physical abuse were made against a staff member who cared for their children. WHC's conscious disregard for the safety of the Cuddle Care children had a great probability of substantial harm, which unfortunately befell A.F.
B. WHC's Authorization, Participation in, or Ratification of Vaughan'sActs
 {¶ 44} In addition to evidence of WHC's actual malice, the punitive damages award against WHC had requisite support under R.C. 2315.21(C)'s alternative basis: WHC's authorization, participation in, or ratification of Vaughan's acts against A.F.
 {¶ 45} In their original and amended complaints, plaintiffs claimed that Vaughan physically assaulted, severely beat, and/or struck A.F. with an object that left plainly visible marks, cuts, and contusions on the child's back, buttocks, and thighs, and caused him severe emotional harm. Plaintiffs alleged that Vaughan's acts constituted an intentional assault and battery upon the child and that Vaughan's actions were malicious, willful, and/or wanton and/or displayed a reckless disregard for the child's welfare.
 {¶ 46} In their answers to both the original and amended complaints, defendants denied that Vaughan's conduct was "wrongful" but they admitted: (1) Vaughan was an employee and/or agent of WHC, (2) "at all alleged relevant times Defendant Vaughan was acting within the scope of his employment with Defendant [WHC]," (3) "Defendant Vaughan's actions are deemed to be the actions of Defendant [WHC]," and (4) "Defendants admit that Defendant [WHC] is liable for the acts of its employee Defendant Vaughan." Defendants' answer to the amended complaint was filed approximately three *Page 20 
weeks before trial, after discovery was complete and defendants were aware of the specific allegations against Vaughan.
 {¶ 47} As a general rule, parties' written admissions made in the progress of a case are binding. Duncan v. Charter One Bank, Scioto App. No. 02CA2855, 2003-Ohio-1907, at ¶ 15, citing Peckham Iron Co. v.Harper (1884), 41 Ohio St. 100, 106. "A party who has alleged and has the burden of proving a material fact need not offer any evidence to prove that fact if it is judicially admitted by the pleadings of the adverse party." Gerrick v. Gorsuch (1961), 172 Ohio St. 417, at paragraph two of the syllabus. To operate as a judicial admission, an allegation in a pleading must be an unequivocal allegation of a material fact. Faxon Hills Constr. Co. v. United Brotherhood of Carpenters
(1958), 168 Ohio St. 8, at paragraph one of the syllabus. Parties cannot repudiate their written admissions at their pleasure. Peckham, supra. See, generally, Civ. R. 15.
 {¶ 48} Defendants acknowledge on appeal that a principal "knowingly ratifies" the unauthorized act of an agent only if the principal "with full knowledge of the facts, conducts himself or herself in a way which manifests the intention to approve an earlier act performed by the agent." (Defendants' appellate brief, 21.) Here, WHC unequivocally accepted liability for Vaughan's conduct after it knew from plaintiffs' allegations in the complaint and from the completion of discovery that Vaughan's "acts" included intentional acts of battery against A.F. causing him permanent and severe physical and emotional harm. WHC could have denied liability for any of Vaughan's intentional conduct but instead chose to admit that Vaughan's actions are deemed to be actions of WHC. If WHC's pleading meant to admit only vicarious liability under respondeat superior, it was inartfully worded and went well beyond such a narrowed admission. *Page 21 
 {¶ 49} In the final analysis, after admitting Vaughan's actions were those of WHC, WHC never averred in a pleading, or argued at trial, that if Vaughn beat A.F., his acts were not those of WHC or were outside the course and scope of his employment. As a result of WHC's unequivocal admissions, plaintiffs were not required to prove that, and the trial court was not required to instruct the jury to determine if, WHC "knowingly authorized, participated in or ratified" Vaughan's actions. Plaintiffs were therefore entitled to recover punitive damages from WHC on the alternative basis under R.C. 2315.21(C).
 {¶ 50} Based on the foregoing, the trial court did not err in imposing punitive damages against WHC specifically based upon either (1) evidence of WHC's actual malice or (2) WHC's judicial admissions accepting liability for Vaughan's actions.
C. WHC's Liability to Pay the Punitive Damages Awarded againstVaughan
 {¶ 51} Defendants next assert the trial court erred in ordering WHC to pay an additional $100,000 in punitive damages that the jury awarded against Vaughan.
 {¶ 52} Although the jury awarded plaintiffs $100,000 in punitive damages from Vaughan, R.C. 2315.21(D)(2)(b) provides that "[i]f the defendant is a small employer or individual, the court shall not enter judgment for punitive or exemplary damages in excess of * * * ten percent of the employer's or individual's net worth when the tort was committed[.]" The parties stipulated below that Vaughan had no net worth at the time the tort was committed. Because Vaughan had no net worth, the trial court concluded R.C 2315.21(D)(2)(b) excuses him from paying the punitive damages awarded against him, and the court entered judgment against Vaughan in the amount of $0 for the punitive damages. SeeFaieta, supra, at ¶ 97-99. Then, finding that WHC admitted liability for Vaughan's actions and was jointly and severally liable for Vaughan's conduct and for the *Page 22 
damages awarded against him, the trial court entered judgment against WHC for the $100,000 in punitive damages based upon WHC's vicarious liability. Id. at ¶ 98-101.
 {¶ 53} Defendants claim the trial court was prohibited from imposing the $100,000 in punitive damages against WHC solely on the basis of vicarious liability. Relying on Comer v. Risko, 106 Ohio St.3d 185,2005-Ohio-4559, at ¶ 20-25, defendants contend that once an employee's primary liability for punitive damages is extinguished, the employer's secondary, vicarious liability also necessarily is extinguished. Defendants thus argue that because R.C. 2315.21(D) extinguishes Vaughan's primary liability for the $100,000 in punitive damages, WHC's secondary, vicarious liability for the damages likewise is extinguished.
 {¶ 54} In Comer, the Supreme Court of Ohio reaffirmed the general rule that "an employer or principal is vicariously liable for the torts of its employees or agents under the doctrine of respondeatsuperior[.]" Id. at ¶ 18. An agent who committed the tort is primarily liable for his actions, while the principal is merely secondarily liable. Id. at ¶ 20. If the agent's primary liability is extinguished, either through settlement and release or a favorable judgment, the principal's secondary liability also necessarily is extinguished. Id. at ¶ 21. Thus, "there can be no vicarious liability imputed to a principal, if there is no liability on the part of the agent." Id., citingLosito v. Kruse (1940), 136 Ohio St. 183.
 {¶ 55} Here, R.C. 2315.21(D)(2)(b) does not alter or extinguish the jury's factual determination that Vaughan is liable for $100,000 in punitive damages. See Arbino v. Johnson Johnson, 116 Ohio St.3d 468,2007-Ohio-6948, at ¶ 37-40 (determining tort-reform statutes do not alter a jury's factual findings). Application of the statute merely excuses or exempts Vaughan from paying the punitive damages; it does not provide that *Page 23 
other tortfeasors who are jointly and severally liable for the punitive damages are also excused from payment where those tortfeasors do not otherwise meet R.C. 2315.21(D)(2)(b)'s exemption requirements. WHC does not argue it is a "small employer" under R.C. 2315.21(D)(2)(a) that is excused from its joint and several liability because it had no net worth when the tort was committed. The trial court did not err in entering judgment against WHC for the $100,000 in punitive damages based upon WHC's vicarious liability as Vaughan's employer.
 {¶ 56} Having concluded the trial court did not err in entering judgment against WHC for punitive damages based upon both its direct and vicarious liability, we overrule defendants' second and third assignments of error.
V. Fourth Assignment of Error — New Trial Due to EvidentiaryRulings {¶ 57} In their fourth assignment of error, defendants assert they are entitled to a new trial due to several erroneous and prejudicial evidentiary rulings made during trial: (1) admission of hearsay statements A.F. made, (2) exclusion of evidence regarding the investigative conclusions of FCCS and CPD, and (3) exclusion of a purported incident report relating to the Z.C. incident.
 {¶ 58} The admission or exclusion of evidence rests within the sound discretion of the trial court. State v. Robb (2000), 88 Ohio St.3d 59,68. Absent an abuse of discretion and material prejudice to the appellant, an appellate court will not disturb a trial court's ruling as to the admissibility of evidence. State v. Martin (1985),19 Ohio St.3d 122, 129. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151,157. *Page 24 A. Admission of A.F.'s Hearsay Statements
 {¶ 59} Defendants contend the court erred in permitting Michael Faieta, A.F.'s father, and Dr. Diserio, to testify regarding A.F.'s statements to them that Vaughan "spanked" him.
 {¶ 60} Prior to trial, defendants moved in limine to preclude any testimony regarding A.F.'s statements that Vaughan spanked or assaulted him. The trial court denied defendants' motion, indicating it would admit A.F.'s statement to his father as an excited utterance under Evid. R. 803(2), and it would permit Dr. Diserio to testify regarding A.F.'s statements to her during therapy pursuant to the medical treatment exception set forth in Evid. R. 803(4).
 {¶ 61} A trial court's ruling on a motion in limine is merely a tentative, preliminary or presumptive ruling about an evidentiary issue. An appellate court need not review the propriety of a decision on a motion in limine unless the claimed error is preserved by an objection, proffer, or ruling on the record when the issue is actually reached and the context is developed at trial. State v. Grubb (1986),28 Ohio St.3d 199, 203, citing Palmer, Ohio Rules of Evidence Rules Manual (1984), at 446; Estate of Beavers v. Knapp, 175 Ohio App.3d 758, 2008-Ohio-2023, at ¶ 69.
 {¶ 62} At trial, Michael Faieta testified, without objection, that "[A.F.] told me that Mr. Vaughan spanked him with a knife." Plaintiffs' counsel repeated the statement, without objection, in questions to Mr. Faieta on direct examination. Comparable statements attributed to A.F. were presented, again without objection, in the testimony of Lacey Faieta, A.F.'s mother, and CPD Detective Deanna Franks, who investigated allegations that Vaughan physically abused A.F. *Page 25 
 {¶ 63} Similarly, Dr. Diserio, who diagnosed A.F. as suffering from post-traumatic stress disorder and provided psychological counseling and treatment to him following the incident, twice testified on direct examination that A.F. told her during therapy sessions that Vaughan had spanked him on his bottom or butt. Prior to Dr. Diserio's testimony, defendants, through defense counsel, advised the court they would object to the statements when Dr. Diserio testified, but defendants did not object; rather, defendants repeated A.F.'s statements in cross-examining Dr. Diserio.
 {¶ 64} Because defendants failed to object during trial when the statements were introduced, they failed to preserve the claimed error for this court's consideration on appeal. Pleasant v. EMSA Corr. Care,Inc., Franklin App. No 03AP-1161, 2004-Ohio-4554, at ¶ 21-22;Grubb, supra, at 202-203. Even if objections had properly been made during trial, the trial court did not abuse its discretion in permitting testimony regarding A.F.'s statements that Vaughan "spanked" him.
 {¶ 65} Hearsay is a statement, other than one the declarant made at trial, offered into evidence to prove the truth of the matter asserted. Evid. R. 801(C). Although hearsay generally is inadmissible as evidence under Evid. R. 802, numerous exceptions exist. Evid. R. 803(2) permits the admission of "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In order for the statement to be admissible: (1) an event startling enough to produce a nervous excitement in the declarant must occur; (2) the statement must have been made while the declarant still is under the stress of excitement the event caused; (3) the statement must relate to the startling event; and (4) the declarant must have personally observed the startling event. State v. Taylor
(1993), 66 Ohio St.3d 295. *Page 26 
 {¶ 66} The lapse of time between the event and the statement, the mental and physical condition of the declarant, the nature of the statement, and the influence of intervening circumstances also should be considered. State v. Harrison, Franklin App. 06AP-827, 2007-Ohio-2872, at ¶ 17. "There is no per se amount of time after which a statement can no longer be considered to be an excited utterance." Taylor, supra, at 303. Generally, children are likely to remain in a state of nervous excitement longer than an adult. Id. at 304.
 {¶ 67} The evidence demonstrates A.F. told his father that "Vaughan spanked him with a knife" within a few hours after his father picked him up from the Cuddle Care classroom at WHC and discovered the marks on his body. The record indicates that from the time Mr. Faieta picked up A.F. at WHC until A.F. made the statement to him in the car less than two hours later, A.F. was uncharacteristically reserved, anxious, visibly upset, agitated, crying, and intermittently exhibiting pain. The evidence thus suggests that A.F.'s statement to his father was made while A.F. was still under the stress of the event and was not the result of reflective thought. Taylor, supra, at 303. Contrary to defendants' contention on appeal, no evidence indicates anyone suggested to A.F. that Vaughan or physical abuse caused his marks. Defendants have not demonstrated the trial court abused its discretion in admitting A.F.'s statement to his father as an excited utterance pursuant to Evid. R. 803(2). See, e.g., State v. Boston (1989), 46 Ohio St.3d 108
(statements by two-year-old child made hours after abuse qualified as an excited utterance); Presley v. Presley (1990), 71 Ohio App.3d 34
(concluding statements made by a three-year old two months after being abused qualified as an excited utterance). *Page 27 
 {¶ 68} Evid. R. 803(4) permits the admission of statements made for purposes of medical diagnosis or treatment that describe the cause or external source of past pain or sensations and which are reasonably pertinent to the diagnosis or treatment. A.F.'s statements to Dr. Diserio that Vaughan had "spanked him on the butt" fell within Evid. R. 803(4)'s exception because his statements were made during therapy sessions and referenced the cause or source of his pain and emotional problems that led to his psychological treatment. See, e.g., State v.McWhite (1991), 73 Ohio App.3d 323 (concluding psychologist's testimony regarding statements made by a three-year old during treatment was admissible pursuant to Evid. R. 803[4]); Presley, supra (determining social worker's testimony regarding statements made by a child abuse victim to a social worker identifying the abuser were admissible under Evid. R. 803[4]).
 {¶ 69} Because A.F.'s statements that Vaughan "spanked" him were admissible under Evid. R. 803(2) and (4), the trial court did not abuse its discretion in admitting the statements into evidence.
B. Exclusion of the Content and Results of FCCS and CPDInvestigations
 {¶ 70} The trial court ruled in limine that it would permit FCCS investigator Sonya Harrison and CPD Detective Deanna Franks to testify about their observations during their agencies' investigations, but testimony about the conclusions FCCS or CPD reached would be prohibited in order to avoid juror confusion. The trial court also excluded (1) the report of the criminal investigation CPD conducted into plaintiffs' allegations of physical abuse against A.F. and (2) a February 23, 2006 letter from FCCS to Cornell at WHC that stated FCCS' conclusion regarding allegations that Vaughan physically abused A.F. *Page 28 
 {¶ 71} Defendants note the jury was permitted to hear testimony that FCCS and CPD conducted investigations into plaintiffs' allegations of Vaughan's physically abusing A.F., but the jury was not permitted to hear the results of those investigations. Noting FCCS' conclusion that plaintiffs' allegations were "unsubstantiated" and CPD's decision to close its case and not prosecute, defendants contend they were prejudiced because the excluded evidence undoubtedly caused the jury to believe the agencies had made findings adverse, not favorable, to defendants.
 {¶ 72} Pursuant to Evid. R. 403, relevant evidence may be excluded if the danger of unfair prejudice, confusing the issues, or misleading the jury substantially outweighs the probative value of the evidence. The trial court had the discretion to determine, as it did, that the prejudicial and confusing impact on the jury outweighed any marginal relevance of the agencies' conclusions. The trial court did not abuse its discretion in determining the conclusions of FCCS and CPD were irrelevant to the issues presented to the jury in this case because government agencies have different purposes, consider different questions, and apply different standards to their investigations.Faieta, supra, at ¶ 59. See Mowery v. Columbus, Franklin App. No. 05AP-266, 2006-Ohio-1153, at ¶ 65-66 (upholding trial court's decision not to permit evidence of an EEO report defendant city issued due to the potential for unfair prejudice to the plaintiff and a substantial danger of jury confusion that an interplay between the report's "probable cause" conclusion and the jury's responsibility to independently evaluate the trial evidence would cause).
 {¶ 73} Error in the admission or exclusion of evidence is grounds for reversal only where substantial rights of the complaining party were affected or substantial justice appears not to have been done.Mowery, supra, at ¶ 67. To determine whether a *Page 29 
substantial right of the party has been affected, a reviewing court must decide whether the trier of fact probably would have reached the same conclusion had the error not occurred. Id. Here, the trial court's excluding the investigative reports or conclusions of FCCS and CPD did not affect defendants' substantial rights; nor did the trial court's ruling prevent substantial justice. The jury appropriately reached its own conclusions and rendered its verdicts after independently evaluating and weighing the evidence presented in this case. Defendants have not demonstrated that the trial court abused its discretion or affected defendants' substantial rights in excluding conclusions of the governmental agencies' reports and conclusions based upon different standards and evidence than at issue here.
C. Exclusion of the Z.C. Incident Report
 {¶ 74} In their final evidentiary claim, defendants contend the trial court erred in denying admission of a copy of the incident report Vaughan purportedly prepared in connection with Z.C.'s injuries on October 13, 2005. Defendants argue (1) the incident report satisfied the business record exception found in Evid. R. 803(6), and (2) the document was not hearsay because it was not offered to establish the truth of the matters contained in the report but to establish what WHC knew about the Z.C. incident.
 {¶ 75} The trial court concluded defendants presented an insufficient foundation to admit the incident report into evidence as a business record because no witness properly authenticated it. Evid. R. 901(A) requires that a proponent of a document produce "evidence sufficient to support a finding that the matter in question is what its proponent claims" it to be. "A writing may be authenticated under Evid. R. 901(B)(1) by testimony of a witness who has firsthand knowledge of the execution, preparation or custody of the *Page 30 
writing." Creggin Group, Ltd. v. Crown Diversified Indus. Corp. (1996),113 Ohio App.3d 853, 863, appeal not allowed (1997), 77 Ohio St.3d 1525, citing 1 Weissenberger Ohio Evidence (1991), Section 901.14.
 {¶ 76} Here, Vaughan testified he prepared an incident report after Z.C. was injured, but he was unsure when he prepared the report. He stated he recognized his own words in the incident report defendants proffered, but he also stated it was not the incident report he prepared. Because no other witness authenticated the document to be what defendants claimed it to be, the trial court properly excluded it. SeeCreggin, supra (determining the trial court did not abuse its discretion in excluding the documents in question as not adequately authenticated where no one with firsthand knowledge of the documents' execution or preparation testified to their authenticity).
 {¶ 77} Even if the trial court erred by refusing to admit the incident report, defendants suffered no prejudice. Vaughan testified about the content of the report and also testified at length about the Z.C. incident. Moreover, as director of WHC's Cuddle Care program, Cornell testified to what WHC knew about the Z.C. incident. In short, the trial court's decision to exclude the incident report did not adversely affect defendants' substantial rights because evidence concerning the incident report and WHC's knowledge of the incident was admitted by other means.
 {¶ 78} Having found no error, let alone prejudicial error, in the trial court's evidentiary rulings, we overrule defendants' fourth assignment of error.
VI. Fifth Assignment of Error — Verdicts against Manifest Weight ofEvidence {¶ 79} In their fifth assignment of error, defendants claim the jury's verdicts are against the manifest weight of the evidence. Defendants fail, however, to present any *Page 31 
factual argument in support of their claimed error or to provide citations to relevant portions of the record as required by App. R. 16(A)(7). Because we determined sufficient evidence supports the jury's verdict against WHC, and defendants failed to comply with the appellate rules with regard to their fifth assignment of error, we decline to decide it. App. R. 12(A)(2).
VII. Sixth Assignment of Error — Verdict Forms andInterrogatories {¶ 80} In their sixth assignment of error, defendants contend the trial court committed plain error by submitting to the jury general verdict forms and interrogatories that did not require the jury to (1) specify the amount of compensatory and punitive damages awarded to each individual plaintiff, and (2) identify which defendant must pay the damages. Defendants' claim is unpersuasive.
 {¶ 81} The plain error doctrine is applied in civil cases only "in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process * * * itself." Noble v. Noble, Franklin App. No. 07AP-1045,2008-Ohio-4685, at ¶ 20, citing Goldfuss v. Davidson (1997),79 Ohio St.3d 116, syllabus.
 {¶ 82} Here, no "exceptional circumstances" justify applying the plain error doctrine. The general verdict forms, submitted to the jury with the parties' agreement, complied with Civ. R. 49(A), which requires a trial court to use a general verdict form "by which the jury finds generally in favor of the prevailing party." Shellhouse v. Norfolk Western Ry. Co. (1991), 61 Ohio St.3d 520, syllabus. In accordance with R.C. 2315.18 and 2315.21, the jury's general verdicts, accompanied by the jury's answers to the interrogatories, properly specified the total compensatory damages plaintiffs recovered *Page 32 
from each defendant, the portions of the total compensatory damages that represent damages for economic and non-economic losses, as well as the liability of each defendant for punitive damages and the amount of those punitive damages. See R.C. 2315.18(D), and R.C. 2315.21(A)(2) and (D)(1).
 {¶ 83} "The essential purpose to be served by interrogatories is to test the correctness of a general verdict by eliciting from the jury its assessment of the determinative issues presented by a given controversy in the context of evidence presented at trial." Cincinnati RiverfrontColiseum, Inc. v. McNulty, Co. (1986), 28 Ohio St.3d 333, 336-337. Through its verdicts and answers to the special interrogatories, the jury made its decision on damages clear, and its verdict and answers were entirely consistent with one another.
 {¶ 84} Notably, defendants not only failed to object to the jury interrogatories and verdict forms, they invited the alleged error. Defendants drafted verdict forms and interrogatories and submitted them to the trial court. Like those actually submitted to the jury, defendants' drafts asked the jury to determine the amount of damages awarded to "plaintiffs" collectively, not individually, and they did not ask the jury to apportion each type of damages between each defendant. "Under the invited-error doctrine, `[a] party will not be permitted to take advantage of an error which he himself invited or induced.'"State v. Bey (1999), 85 Ohio St.3d 487, 493, quoting Hal ArtzLincoln-Mercury, Inc. v. Ford Motor Co., Inc. (1986), 28 Ohio St.3d 20, at paragraph one of the syllabus (following Lester v. Leuck [1943],142 Ohio St. 91, at paragraph one of the syllabus). *Page 33 
 {¶ 85} Because defendants invited the asserted error, and the general verdict forms and interrogatories the jury answered were not plainly erroneous, we overrule defendant's sixth assignment of error.
VIII. Seventh Assignment of Error — Application of Caps inR.C. 2315.21 {¶ 86} In their seventh assignment of error, defendants assert the trial court erred in the manner in which it applied R.C. 2315.21(D)(2)(a) to the jury's $5 million punitive damages award against WHC. R.C. 2315.21(D) provides that "[i]n a tort action, the trier of fact shall determine the liability of any defendant for punitive or exemplary damages and the amount of those damages." R.C. 2315.21(D)(1). Nonetheless, "[t]he court shall not enter judgment for punitive or exemplary damages in excess of two times the amount of the compensatory damages awarded to the plaintiff from that defendant, as determined pursuant to division (B)(2) or (3) of this section." R.C. 2315.21(D)(2)(a). R.C. 2315.21(B)(2) provides that in a tort action tried to a jury "and in which a plaintiff makes a claim for both compensatory damages and punitive or exemplary damages," the court must "instruct the jury to return, and the jury shall return, a general verdict, and if that verdict is in favor of the plaintiff, answers to an interrogatory that specifies the total compensatory damages recoverable by the plaintiff from each defendant." See, also, R.C. 2315.21(B)(3) (using similar language but in the context of a bench trial).
 {¶ 87} After the jury's verdict, defendants moved the trial court to apply R.C. 2315.21(D)(2)(a)'s statutory cap to the $5 million in punitive damages the jury awarded against WHC. Following an extensive analysis of the statute and the legislative intent in limiting punitive damages, the trial court concluded R.C. 2315.21(D)(2)(a)'s statutory cap, limiting judgments for punitive damages to "two times the amount of the compensatory *Page 34 
damages awarded to the plaintiff from that defendant," should be calculated based upon the total, uncapped compensatory damages the jury awarded against defendants. See Faieta, supra, at ¶ 82-93. Because in this case the jury awarded plaintiffs a total of $764,235 in compensatory damages against WHC, the trial court determined plaintiffs are entitled to recover punitive damages against WHC of two times that amount: $1,528,470. Id. at ¶ 93.
 {¶ 88} Defendants argue that in applying R.C. 2315.21(D)(2)(a), the trial court should have limited the punitive damages to two times the amount of the "capped" compensatory damages plaintiffs could receive after the court applied R.C. 2315.18(B)(2), which limits the recovery of noneconomic damages in certain tort actions. See Arbino, supra, at ¶ 28. The record demonstrates R.C. 2315.18(B)(2)'s application in this case indisputably limited, or "capped," the recovery of A.F.'s non-economic damages at $250,000, $350,000 less than the $600,000 the jury awarded. See Faieta, supra, at ¶ 77-81. Because noneconomic damages are a component of compensatory damages, the amount of compensatory damages plaintiffs could recover against WHC also was capped, as reflected in the trial court's judgment. Defendants argue that "recoverable" in R.C. 2315.21(B)(2) and (3) demonstrates that the punitive damages limitation in R.C. 2315.21(D)(2) must be calculated by using capped compensatory damages, which are legally recoverable, rather than uncapped noneconomic damages, which are not "recoverable" as a matter of law. See R.C. 2315.18(E)(1) and (F)(1).
 {¶ 89} In resolving the issue, our paramount concern is to determine the legislature's intent in enacting R.C. 2315.21(D)(2)(a). To do so, we first look to the language of the statute. Hubbell v. Xenia,115 Ohio St.3d 77, 2007-Ohio-4839, at ¶ 11. *Page 35 
We must consider the statutory language in context, construing words and phrases according to the rules of grammar and common usage. Bartchy v.State Bd. of Edn., ___Ohio St.3d___, 2008-Ohio-4826, at ¶ 16. If the language is plain and unambiguous, we apply the statute as written to give effect to the words used and not delete words or insert words not used. Davis v. Davis, 115 Ohio St.3d 180, 2007-Ohio-5049, at ¶ 13-15. Statutes that explicitly refer to each other are read in pari materia so as to give effect to each statute. Brooks v. Ohio State Univ. (1996),111 Ohio App.3d 342, 349.
 {¶ 90} R.C. 2315.21(D)(2) explicitly provides that the "compensatory damages awarded to the plaintiff from that defendant, as determined pursuant to [R.C. 2315.21(B)(2) or (3)]," are to be used to calculate the cap on punitive damages. Those statutory provisions refer to the uncapped, total compensatory damages the jury awarded. In reaching our conclusion, we do not construe the term "recoverable" in R.C. 2315.21(B)(2) and (3) to be as narrow as defendants urge. Both R.C. 2315.21(B)(2) and (3) direct the trier of fact to make factual findings that specify the total compensatory damages to be awarded to the plaintiff from each defendant. R.C. 2315.21(B)(2) and (3) make no reference to statutory caps on damage awards, and R.C. 2315.18(F)(2) expressly precludes the trial court from informing the jury of the existence of statutory caps. The court applies statutory caps on compensatory damages only after the jury has rendered its verdict and made an award of compensatory damages in the case. See R.C. 2315.18(E)(1). Accordingly, we conclude the total compensatory damages referenced in R.C. 2315.21(B)(2) are the uncapped compensatory damages the jury awarded. *Page 36 
 {¶ 91} Because the trial court did not err in finding that plaintiffs are entitled to punitive damages from WHC at two times the total, uncapped compensatory damages awarded to plaintiffs from WHC, we overrule defendants' seventh assignment of error.
IX. Conclusion {¶ 92} Having declined to address defendants' fifth assignment of error and having overruled the remaining assignments of error, we affirm the trial court's judgment against defendants Vaughan and WHC.
Judgment affirmed.
SADLER and BOWMAN, JJ., concur.
 BOWMAN, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 1